[Civ. No. 5902. Fifth Dist. Mar. 4, 1983.]

TEAMSTERS AGRICULTURAL WORKERS UNION, LOCAL 946,
Plaintiff and Appellant, v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA et al.,
Defendants, Cross-complainants and Respondents;
WESTERN CONFERENCE OF TEAMSTERS, Defendant and Respondent;
PETE BACLIG, JR., et al., Cross-defendants and Appellants.

[Opinion certified for partial publication.[1]]

---

[1]Part IV (only) is not published, as it does not meet the standards for publication contained in rule 976(b), California Rules of Court.

548

COUNSEL

Duenow, Burke & Smith and J. Edmund Smith for Plaintiff and Appellant and for Cross-defendants and Appellants.

Silver & Kodish and Martin H. Kodish for Defendants, Cross-complainants and Respondents and for Defendant and Respondent.

OPINION

ANDREEN, J.—

## I. INTRODUCTION

■ ■■■ Plaintiff, Teamsters Agricultural Workers Union Local 946 (Local 946), brought this action under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) (29 U.S.C. §§ 401-531)[2] to enjoin continuation of a trusteeship imposed by defendant International Brotherhood of Teamsters (the International)[3] in 1975.

The International cross-complained against individuals who had been elected officers of Local 946 for conversion and an accounting of funds collected by them.

The trial court conducted the trial without a jury and found for the International and other defendants on the complaint and for the International and against the individuals on the cross-complaint. This appeal followed.

## II. FACTS

In August 1975, the International issued a charter to Local 946 and impressed upon it a trusteeship to manage its affairs. No issue is raised on appeal as to the validity of the action imposing the trusteeship. The charter became officially effective on January 1, 1976. Frank Fitzsimmons, the International's general

---

[2]"It is well established that a state court has concurrent jurisdiction to enforce a right created by federal law unless the law excludes concurrent jurisdiction or is incompatible with such jurisdiction." (*S.P. Growers Assn.* v. *Rodriguez* (1976) 17 Cal.3d 719, 726 [131 Cal.Rptr. 761, 552 P.2d 721]; see *Dowd Box Co.* v. *Courtney* (1962) 368 U.S. 502, 507-508 [7 L.Ed.2d 483, 486-487, 82 S.Ct. 519].) The LMRDA subchapter on trusteeships provides: "Any member or subordinate body of a labor organization affected by any violation of this subchapter . . . may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate." (29 U.S.C. § 464(a).) Because the provision does not expressly or impliedly preclude state court jurisdiction and there appears no reason why state courts are any less competent than federal courts to resolve trusteeship disputes, federal-state jurisdiction is concurrent under the subchapter. (Cf. *McCarroll* v. *L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 59-60 [315 P.2d 322] [state courts have jurisdiction to hear actions to enforce collective bargaining agreements under the Labor-Management Relations Act of 1947, which contains a similarly worded jurisdictional provision].)

[3]Also named as defendants, and present before this court as respondents, are the Western Conference of Teamsters (Western Conference) and Ralph Cotner, the appointed trustee for Local 946. The International, Western Conference and Cotner are jointly represented in this appeal. In the context of arguments advanced in this court, "the International" will refer to all three respondents.

president, appointed respondent Ralph Cotner trustee. During his stint as trustee, Cotner also held a position as director of Western Conference's agricultural division.

Although Cotner was unsuccessful in his efforts to obtain authorization from growers' associations to have contracts covered by the Teamsters' Agricultural Master Agreement assigned to Local 946, Cotner delegated to the local the task of administering the master agreement as it pertained to signatory growers within the local's jurisdiction. Administration of the contracts included enforcing the contract's provisions, handling grievances, serving covered employees, and interpreting contract provisions. In this role, Local 946 acted as an agent of Western Conference.

Financially, Local 946 was at least partially dependent upon the International. In particular, the International authorized a grant to Local 946 in a minimum amount of $100,000 per month to meet operating expenses and financial obligations; Western Conference also supplied the local with staff members and accounting facilities. Like other Teamster locals in the California agricultural sector, Local 946 incurred exorbitant expenses in competing with the United Farm Workers (UFW) for organizational representation of agricultural workers. To this end, Local 946 paid in excess of $500,000 in attorney fees and other litigation expenses incurred in agricultural labor matters from August 1975 through July 1977.

Despite its financial dependence, the local by mid-1976 apparently was operating smoothly and independently. On August 3, 1976, Cotner wrote a letter to M. E. Anderson, Western Conference's international director, requesting that Local 946 be granted autonomy. Cotner wrote:

"Local 946, one of our chartered farm local unions, has been in trusteeship since it was originally chartered. I have worked closely with this Local Union over the past 12 months and I now find that the Local Union is operating in good fashion and has a stable income; a well trained staff; under good leadership; and it is my conviction and recommendation that autonomy should be granted to Local 946.

"..............................

"It is my sincere hope that the recommendation meets with your approval, and that you will take every step to expedite action by the International Union. It is our hope that the nominations for officers of this Local Union can be conducted in the month of September for elections in the month of October. This is

based on the peak employment season which must be considered when electing officers in our Local Unions."

Cotner testified the letter was a "prelude" to taking Local 946 out of trusteeship, and that election of officers was suggested as a "step in the direction of placing the local . . . in local autonomy."

On September 15, 1976, General President Fitzsimmons telegrammed Western Conference, authorizing the election of officers for Local 946. The telegram noted the election of officers would constitute a "preliminary step to the release of Local 946 from trusteeship" and asked that Fitzsimmons' office be notified of the election results "as soon as the election has taken place." Fitzsimmons, however, continued: "Every effort will be made to expedite the release of the local from trusteeship after the conduct of the election. However, please note that article VI, section 5 of the International Constitution provides in part that 'the trustee shall not install the officers elected at such election until directed to do so by the General President.' Accordingly, the officers elected in the forthcoming election should not be installed until you have been advised by this office."

The local held elections during the week ending October 23, 1976. Appellants Uribe (president), Maturino (vice president), Baclig (secretary-treasurer), Macias (recording secretary), Mendoza (trustee), Enriquez (trustee), and Rugnao (trustee) ran unopposed and were duly elected as officers. In a letter dated November 2, 1976, Cotner requested permission from General President Fitzsimmons to install the officers. Fitzsimmons, however, never responded to Cotner's request for authorization.

Shortly before December 1, 1976, Cotner was informed that a jurisdictional pact was being negotiated between Western Conference and the UFW, and was instructed that pending the outcome of those negotiations, the local was not to file any petitions with the Agricultural Labor Relations Board for representation elections. Cotner immediately relayed this information to Baclig and Mendoza, and shortly thereafter sent a mailgram to the same effect.

Not knowing the lack of authorization for installation of the officers, an officer of a sister Teamsters local installed them in early 1977.

Meanwhile, as discussed below, an organizational pact had been negotiated with the UFW and Cotner gave the order to Local 946 to shut down. The cross-defendants failed to do so and received money from employers and deposited the funds in a bank. They did this because at a February membership meeting, the officers informed the membership of the International's intention to shut

down the local and asked the members what position should be taken. The membership responded with a petition indicating opposition to the jurisdictional pact and demanding the reopening of Local 946's offices, threatening "massive lawsuits" if the demand were not met.

Local 946's officers were officially discharged by a letter from Cotner dated March 22, 1977. The reason given for the discharges was that due to the jurisdictional pact, "the need for personnel has been drastically reduced."

The Teamsters-UFW jurisdictional pact was signed in late March or early April 1977; the agreement was made effective beginning March 10, 1977. The signatories of the agreement were representatives of the International, Western Conference, and the UFW.

In late 1977, the International's general executive board approved the merger of Local 946 into Los Angeles-based Local 63. The merger was effective December 31, 1977.

### III. WAS THE TRUSTEESHIP CONTINUED BEYOND AN 18-MONTH PERIOD FOR A PERMISSIBLE PURPOSE UNDER THE LMRDA?

Local 946 contends the International failed to justify continuing the trusteeship beyond an initial 18-month period under the LMRDA.

Congress enacted the trusteeship provisions of the LMRDA "to prevent the abuses historically associated with trusteeships." (*Higgins* v. *Harden* (9th Cir. 1981) 644 F.2d 1348, 1350.) Union self-preservation is not of itself an adequate justification for continuing a trusteeship, nor is a union's desire to control "dissident elements." (*Benda* v. *Grand Lodge of Intern. Ass'n., etc.* (9th Cir. 1978) 584 F.2d 308, 317-318, and fn. 6.) It has additionally been noted the LMRDA sought to curb two particularly offensive purposes behind trusteeships—namely, "[t]he looting of treasuries by the international's officers and the trustee, and the control of votes to help candidates win or maintain positions in international unions." (*Jolly* v. *Gorman* (5th Cir. 1970) 428 F.2d 960, 966.)

To effectuate these goals, the LMRDA limits the permissible purposes and duration of trusteeships imposed by labor organizations upon subordinate bodies. Regarding purposes, the statute provides: "Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collec-

tive bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.'' (29 U.S.C. § 462.) The permissible duration of a duly imposed trusteeship is limited by 29 United States Code section 464(c): ''In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title. *After the expiration of eighteen months the trusteeship shall be presumed invalid in any such proceeding and its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under section 462 of this title. . . .''* (Italics added.)

■■ The core issue is whether the International proved by clear and convincing evidence a permissible purpose for extending the trusteeship beyond an 18-month period, as required by 29 United States Code section 464(c). The International relies upon that portion of section 462 which provides that a trusteeship may be maintained to carry out ''the legitimate objects of such labor organization.'' The congressional aim of this provision was stated in *Jolly* v. *Gorman, supra,* 428 F.2d at page 966: ''[A]lthough Congress listed a few proper purposes for the establishment of trusteeships, it accepted the practical impossibility of formulating a precise definition of proper purpose, and thus 'proper purpose' is broadly defined to include the use of a trusteeship in 'otherwise carrying out the legitimate objects of [the] labor organization.' By defining 'proper purpose' so imprecisely, Congress deliberately left it largely to the courts to determine the legality of trusteeships. *See* Anderson, Landrum-Griffin and the Trusteeship Imbroglio, 71 Yale L.J. 1460, 1500 (1962).''

As Local 946 notes, the 18-month statutory period expired on February 19, 1977. The jurisdictional pact was not signed until late March or early April 1977. Negotiations for the agreement, however, had been ongoing at least since the fall of 1976 and ultimately were productive. The issue thus is whether the consummation and effectuation of the pact were ''legitimate objects'' of the International, and whether maintenance of a trusteeship over Local 946 was necessary to carry out that purpose.

■■■■■ There was substantial evidence below to support the trial court's conclusion that negotiation and effectuation of the jurisdictional

pact provided ample justification for continuing the trusteeship.[4] Jurisdictional policy is a matter committed to a labor organization's internal decisionmaking machinery, and a change in policy is beyond judicial scrutiny absent some statutory policy to the contrary. In this case, the policy shift was a major one, involving a quid pro quo with the UFW which ended a long and bitter inter-union struggle in both the fields and the canneries: the Teamsters agreed to leave the fields and the UFW promised to cease organizational efforts in the canneries. Negotiation and implementation of the pact doubtlessly were extremely sensitive matters, and the International legitimately desired to retain control over agricultural locals so that those who disagreed with the International's jurisdictional shift would not by their actions preclude the reaching of an agreement with the UFW or abrogate any agreement so reached. The trusteeship herein thus was necessary, not to quell dissension simply for the sake of suppressing disagreement, but to insure the effectuation of a laudable and legitimate organizational policy change.

Moreover, the trusteeship device was an expeditious means of achieving what was otherwise inevitable: the dismantling of the locals in preparation for eventual merger. There is no evidence the trusteeship was maintained for a purpose proscribed by the policy behind the LMRDA;[5] to the contrary, public policy supports effectuation of the jurisdictional pact to curtail labor strife in the agricultural realm. It is well established that when injunctive relief is sought, consideration of public policy is not only permissible but mandatory. (*Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548].)

---

[4]The substantial evidence rule is appropriate irrespective of the burden of proof mandated by section 464(c) (i.e., clear and convincing evidence). Although most judicial opinions in the area have not expressly applied that standard, the court in *Bailey* v. *Dixon* (5th Cir. 1971) 451 F.2d 160, 161, noted that the result reached by the trial court was both legally correct and supported by substantial evidence. Application of the standard, of course, requires resolving all factual conflicts and inferences in favor of the judgment and disregarding the weight of the evidence presented. (*Munoz* v. *Olin* (1979) 24 Cal.3d 629, 635-636 [156 Cal.Rptr. 727, 596 P.2d 1143].)

Our Supreme Court has established a clear line of demarcation between trial and appellate functions where a "clear and convincing" standard is applied to evidence. As stated in *In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198]: "Appellants argue insufficiency of the evidence. We apply, with appropriate modifications, our holding in *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 . . ., made in accordance with *Jackson* v. *Virginia* (1979) 443 U.S. 307 . . .: 'the [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [that termination of parental rights is appropriate based on clear and convincing evidence].' (See *In re Marcos S.* (1977) 73 Cal.App.3d 768, 781 . . ., quoting *Garrett* v. *Duncan* (1959) 176 Cal.App.2d 296, 298-299 . . ., and cases cited therein.)"

[5]Local 946's implicit assertion the International raided the local's treasury by requiring payment of attorney fees in Teamster litigation is answered by the fact that the International's grants to the local in five months equaled the amount of attorney fees paid by the local in nearly two years.

Because Local 946's one-sentence challenge to the judgment on the cross-complaint for conversion is dependent upon the asserted invalidity of the trusteeship, that argument also fails.

## IV. DID THE COURT ERR IN IMPOSING SANCTIONS UPON PLAINTIFF'S ATTORNEY FOR NOT ATTENDING A NOTICED HEARING?[6]

## V. CONCLUSION

The judgment is affirmed.

Franson, Acting P. J., and Martin, J., concurred.

---

[6]See footnote 1, *ante.*