[Civ. No. 383. Fourth Appellate District.—May 18, 1931.]

LEWIS STONE, Respondent, v. CITY OF LOS ANGELES (a Municipal Corporation) et al., Appellants.

Erwin P. Werner, City Attorney, Frederick von Schrader, Assistant City Attorney, and Loren A. Butts, Deputy City Attorney, for Appellants.

Charles S. Feeney, Meserve, Mumper, Hughes & Robertson and Timon E. Owens for Respondent.

MARKS, J.—This is an appeal from a judgment enjoining the appellants from leasing certain tide lands and overflowed lands for the purpose of drilling for oil and gas thereon.

Respondent is a resident and taxpayer of the City of Los Angeles and the owner of real property in what was formerly the city of Venice, which property fronts on Santa Monica Bay. The City of Los Angeles is a municipal corporation organized under a freeholders' charter. Raymond E. Hoyt is the superintendent and Charles S. Lamb the secretary of the Department of Playground and Recreation of the City of Los Angeles. The other appellants are commissioners of the Department of Playground and Recreation of the City of Los Angeles. Under the charter and by ordinances of the City of Los Angeles the Department of Playground and Recreation is given "the sole jurisdiction to execute any permits, concessions, licenses and leases upon any tidelands, public beach lands and submerged lands, whether filled or unfilled, belonging to or controlled by the City of Los Angeles . . . provided that any such permit, concession, license or lease is consistent with the trusts under which any of said lands are held by the City of Los Angeles", excepting from the jurisdiction of this department certain harbor frontages and waters with which we are not concerned on this appeal.

In 1917 the legislature of California granted to the city of Venice the tide lands and submerged lands within its boundaries. (Stats. of 1917, p. 89.) The material portions of this act are as follows:

"That said lands shall be used by said city and by its successors, solely for the establishment, improvement, and conduct of a harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and

other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation, and said city, or its successors, shall not, at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purpose whatsoever; provided, that said city, or its successors, may grant franchises thereon, for a period not exceeding twenty-five years, for wharves and other public uses and purposes, and may lease said lands, or any part thereof, for a period not exceeding twenty-five years, for purposes consistent with the trusts upon which said lands are held by the State of California, and with the requirements of commerce or navigation at said harbor. . . .

"Reserving, however, in the people of the State of California the absolute right to fish in the waters of said harbor, with the right of convenient access to said waters over said lands for said purposes."

On November 25, 1925, the city of Venice was consolidated with the City of Los Angeles which thereupon succeeded to whatever rights and interest the city of Venice had in the lands in question. For the purpose of brevity we will hereafter refer to that portion of Los Angeles which was formerly the city of Venice, as the city of Venice.

Respondent earnestly urges upon us the insufficiency of the act, to which we have referred, to vest any title to the property in the city of Venice because of the uncertainty in its description. Under the view which we take of this case, it will be unnecessary for us to decide this question, and for the purposes of this opinion we will assume that the act of the legislature granted to the city of Venice the tide lands and submerged lands within its corporate limits from the line of the mean high tide to the westerly boundary of the state of California.

During the year 1929 a discovery oil-well was drilled near the city of Venice and brought into production. An intensive drilling campaign on the subdivided portion of the city of Venice followed which brought producing oil-wells near to the shore line of the Pacific Ocean. The Department of Playground and Recreation received numerous applications to lease for the purpose of drilling for oil and gas on, and removing the same from the tide lands and submerged lands extending oceanward from the uplands upon which there were producing oil-wells. The evidence and stipulation of

counsel disclose an intention on the part of appellants to lease a portion of these lands if permitted to do so by the courts. The lands upon which the proposed lease would be executed may be roughly described as a tract about 8,000 feet in length and 2,700 feet in width with its easterly line parallel to and 300 feet westerly from the line of mean high tide. The proposed lease was to be for a period of twenty-five years and would permit the lessee to explore, drill for and remove oil and gas from the leased premises.

As the proposed lease was for a period of more than five years the Department of Playground and Recreation could not execute it except upon authority given it by an ordinance passed by the City of Los Angeles. The record fails to disclose that any such ordinance had been passed at the time of the trial. While this question is raised in appellants' brief we understand that the parties desire to have this court pass upon the question of the authority of the officers of the City of Los Angeles to lease the tide lands and submerged lands for the purposes we have mentioned and not to reverse the judgment upon technical grounds alone. The record contains the following stipulation of counsel entered into in open court:

"Mr. Butts: . . . I won't raise the point that the injunction should not be issued by reason of Mr. Robertson's failure to prove that the city council intends to make this lease.

"The Court: Will you accept that stipulation?

"Mr. Robertson: Yes, that is fine.

"Mr. Butts: So that we will have what I understand the stipulation to be, I am willing to stipulate to this, that we do not make any point of the fact that you have not proven that the City of Los Angeles intends to enter into these leases; I do not raise that point here and I will not raise it in any other court. I will put it this way. We won't argue to this court or to any other court that the injunction should not issue because the plaintiff has failed to prove that the City of Los Angeles intends to enter into these leases.

"Mr. Robertson: Very well, relying upon that, if Your Honor please, for the purpose of the record in this court and any other court, the plaintiff has not introduced any evidence on that question of fact as to the intention.

"The Court: Yes. There will be no point made on that technicality.

"Mr. Butts: Yes, that is right."

In the closing paragraphs of appellants' opening brief we find the following: "We have raised the points that the action has been prematurely brought and the leasing of the lands is a legislative act and therefore cannot be enjoined, either of which we think is sufficient to justify the court in reversing the judgment of the trial court. However, we do not urge that the judgment be reversed solely on those grounds. In that event the principal question presented to this court for its decision, i. e., whether or not the act of the legislature hereinabove referred to prohibits the city from leasing said lands for the purposes set forth in respondent's complaint, would be undetermined, which would only result in future litigation."

Under this stipulation and the statement of counsel, we are assuming that the intention of appellants to execute the proposed lease is established, and that the proof of the passage of the ordinance authorizing the Department of Playground and Recreation to execute the lease was waived in the court below. Were it not for this stipulation the conclusions which we have reached in this case might very well have been the reverse of those which we now entertain.

We are passing, without the serious consideration to which it might be entitled, the contention of respondent that by the express terms of the act of the legislature (Stats. 1929, p. 944), amending the State Leasing Act (Stats. 1921, p. 404), appellants are prohibited from executing the lease in question, and appellants reply thereto that the prohibitory clauses of this act do not apply to the instant case because of the constitutional ground that the legislature cannot limit the control of a city over a municipal affair where the right of control is vested in the city by the terms of its charter. While this and numerous other equally interesting questions have been ably presented by counsel, we deem it necessary to consider only the rights and powers of appellants to lease the tide-lands and submerged lands in question under the express terms of the act granting these lands to the city of Venice and the question of whether or not the acts enjoined constitute the exercise of a legislative function by the Department of Playground and Recreation of the City of Los Angeles.

Omitting all of the other questions presented, and confining ourselves to a consideration of the terms of the act

granting the lands in question to the city of Venice, it is admitted by both parties, and we think correctly, that the uses for which these lands may be leased by appellants are limited by the terms of the grant. In other words, appellants cannot lease the property for uses or purposes not authorized by the Granting Act or contemplated by the legislature in passing it.

Again referring to that portion of the Granting Act which we have quoted, we find the uses to which the lands may be put are limited to the following: (1) The city may itself use the lands for the establishment and improvement of a harbor and may construct and maintain the necessary and convenient utilities, structures and appliances to carry out these purposes; (2) the city may grant franchises thereon for a period of not to exceed twenty-five years; (3) the city may *lease* the lands for a like period "for purposes consistent with the trust upon which said lands are held by the State of California, and with the requirements of commerce or navigation at said harbor"; (4) the city cannot grant, convey or give away all or any portion of said lands for any purpose whatsoever.

The mere statement of these powers and limitations make the first two unimportant in this case. The city is not itself proposing to use any portion of these lands and the right to drill for and remove oil or gas therefrom could not be denominated a "franchise" as the term is usually and ordinarily understood and used. The right of the city to *lease* these lands, and the limitation on its power to alienate them, do, however, become important, and we believe controlling in this case.

It is a fundamental canon of the construction of statutes that the words used therein must be held to be used in their usual and ordinary sense unless an intention appears on the part of the legislature to give them some other or special meaning. We have, therefore, to consider the meaning of the word "*lease*" as used in the act and the extent of the power vested in the City of Los Angeles to "*lease*" the premises in question.

A lease, as ordinarily understood, is an agreement whereby the relation of landlord and tenant is created. It imports the giving, for a consideration by the owner of the greater estate, of the possession and use of a lesser estate

in his property with a reversion to the owner of the greater estate at the end of the term. The term has been defined as follows:

"The relation of landlord and tenant is created by contract, either express or implied, by the terms of which one person designated 'tenant' enters into possession of the land under another person known as 'landlord'. And a lease has been defined as a contract for the possession and profits of lands and tenements on the one side, and a recompense of rent or other income on the other; or it is a conveyance to a person for life, or years, or at will, in consideration of a return of rent or other recompense. The person letting the land is called the landlord; and the party to whom the lease is made, the tenant. As has been said, 'a lease doth properly signify a demise or letting of land, etc., unto another for a lesser time than he that doth let it hath in it'; also, as has been said, 'a tenant is one who occupies the premises of another in subordination to that other's title and with his assent express or implied'. Again as ordinarily employed, the word 'lease' implies a term and reversion to the owner of the land after its termination, and only a chattel interest passes." (16 R. C. L. 530.)

When used as a verb.

"To 'lease' is to transfer, for a term specified therein, from the lessor to the lessee, the property therein demised; also to let; to farm out; to rent. There is authority for the view that the word 'leased' may properly be used in two senses, first in describing the act of the lessor in giving the lease, and again in describing the act of the lessee in taking the lease." (35 Cor. Jur. 1139.)

"Hiring is a contract by which one gives to another the temporary possession and use of property, other than money, for reward, and the latter agrees to return the same to the former at a future time." (Civ. Code, sec. 1925.)

"The person letting real estate is called the landlord, and the party to whom the lease is made, the tenant. A tenant is to be distinguished from a mere lodger, who occupies a room or portion of a tenement under the control or in the occupancy of another, and has no interest in the real estate. The terms 'lessor' and 'lessee' are used almost interchangeably with 'landlord' and 'tenant', though in strictness they should refer to the parties to a formal lease.

'Tenancy' and 'leasehold' designate the tenant's estate in the premises let to him. A lease is a contract for the possession and profits of land on one side, and a recompense of rent, or other income, on the other; or it is a conveyance of lands and tenements to a person for life, for years, or at will, in consideration of a return of rent, or other recompense." (15 Cal. Jur. 598.)

An oil lease usually gives to the lessee a limited possession of the surface of the property with the right to erect the necessary structures and install equipment for the drilling of wells. If oil is discovered it is brought to the surface and a certain portion of it then belongs to the lessee as a recompense for his operations. The drilling for oil is classed as a mining operation. An agreement to work a mine upon shares has been held not to be a lease as the term is generally used and understood. (*Hudepohl* v. *Liberty Hill etc. Co.*, 80 Cal. 553 [22 Pac. 339].)

It is now well settled law in California that the lessee of oil land has a different and greater interest in the property than in the usual and ordinary usufructuary lease known to ordinary commerce and trade.

"As to the title of a lessee of oil land, it is held that although is is competent for the parties to create an absolute estate in the subterranean stratum distinct from that of the surface, the ordinary oil lease on a royalty basis—giving the mere right to extract oil for a period of years, leaving title to the oil in the land owner until it is brought to the surface—vests no title in the stratum in place but constitutes a servitude and a chattel real at common law. The right of the lessee under the contract is different, however, from that of the ordinary lessee; it is of such a character that it is subject to taxation." (20 Cal. Jur. 359.)

This principle was recognized in the case of *Bakersfield etc. Co.* v. *Kern County*, 144 Cal. 148 [77 Pac. 892].

In drawing the distinction between the ordinary lease and the oil lease in the case of *Graciosa Oil Co.* v. *Santa Barbara*, 155 Cal. 140 [20 L. R. A. (N. S.) 211, 99 Pac. 483], the Supreme Court said:

"Except when held for speculative purpose, the value of land usually depends on the value of the use and occupation, and consists of a sum equivalent to a principal

which, at the rate of interest usual upon safe investments, will bring a net annual income equal to that which the land will produce. The lessor or land owner annually receives a sum as rent which he deems the equivalent of this annual income, or the value of the use of the land to him, and therefore he enjoys the entire beneficial interest in the premises, including the value of the leasehold as well as of the fee. There are exceptional cases, due to the sudden rise in rental values, where this is not the case. But the general rules in regard to taxation must be made to fit the usual conditions and not the exceptional ones, and statutes are to be construed with this fact in view. Since 1880 there has been no express statutory provision on the subject, but we think that, as to such leasehold estates, the owner of the fee may fairly be deemed to be the owner of the whole estate for purposes of taxation.

"There are material differences between such estates for years and the right and privilege to bore for and extract oil, held by the plaintiff under its oil lease. (See Thornton on Oil, secs. 47, 48.) The plaintiff, it is true, does not own an absolute present title to the oil strata in place. Such an absolute estate in an underlying stratum may be created and the estate of the owner of the overlying land and of the owner of the subterranean stratum will be as distinct and separate as is the ownership of respective owners of two adjoining tracts of land. For purposes of separate ownership land may be divided horizontally as well as superficially and vertically. (Jones on Real Property, sec. 537; *State* v. *Moore*, 12 Cal. 70.) But the contract in question vests no present title in a stratum in place. It leaves the title to the oil in the landowner until it is brought to the surface. The right vested in plaintiff is an estate for years, so far as necessary for the purpose of taking oil therefrom, and it carries with it the right to extract the oil and remove it from the premises. This right constitutes, for the term prescribed, a servitude on the land and a chattel real at common law. (Civ. Code, sec. 801, subd. 5, sec. 802, subd. 6; *Harvey C. & C. Co.* v. *Dillon*, 59 W. Va. 605 [6 L. R. A. (N. S.) 628, 53 S. E. 928-937], and cases there cited; Thornton on Oil Leases, sec. 51.) The royalty is frequently fixed before the discovery of oil, usually at a time when the existence of oil in profitable quantities is a matter of

conjecture, and without regard to the adjustment between the parties of the burden of taxation upon the respective interests. The value represented by the royalty is ordinarily very small, as compared to that of the right of the lessee. After the discovery of oil in such leased ground, the value of the lessor's real interest and right is much less than it would be if he had the whole estate, including all the oil thus discovered. There is no real parallel between such a case and that of a lessor under an ordinary lease for occupation and use. It is well known that such leasehold estates or interests in oil strata, after a discovery of oil, often command large prices in the market, out of all proportion to the value of the interest of the landowner receiving only the royalty and enjoying the use only for other purposes. The right of the lessee under this contract is more than that of the ordinary lessee. It is of a different character and for a different purpose. He has no right at all to the usufruct of the soil. His right extends to the extraction of a certain part of the substance of the land itself, to its permanent separation and removal and its conversion to his own use. The whole object of the contract is to effect, if not technically a sale and conveyance of a substantial and specific part of the land, at least a disposition and transfer thereof to another.''

This distinction was further recognized in the case of *Mohawk Oil Co.* v. *Hopkins,* 196 Cal. 148 [236 Pac. 133]. The foregoing cases have been cited with approval in *County of Ventura* v. *Barry,* 207 Cal. 189 [277 Pac. 333], *People* v. *Associated Oil Co.,* 211 Cal. 93 [294 Pac. 717], and *Merchants Trust Co.* v. *Hopkins,* 103 Cal. App. 473 [284 Pac. 1072].

We have the further distinction between the rights under the oil lease and the usual usufructuary lease in the change in the character of the property in the oil when it is recovered and brought to the surface. In place it is part of the realty and in the absence of a special contract to the contrary belongs to the owner of the ground. When brought to the surface it becomes personal property and a part of it at least belongs to the oil operator. As was said in the case of *County of Ventura* v. *Barry, supra;* ''The operations of lessees under oil leases contemplate the erection of derricks and other structures of an impermanent

character and the sinking of deep wells at large expense, but which derive their main value not from the expenditure necessary to their creation but from the oil content of the land into which they penetrate. If oil or other mineral substance or essence is found and extracted, these immediately become personal property upon their severance from the soil, the value of which is to be realized only by their removal from the place of their extraction to near or distant markets.''

In the case of *Merrill* v. *California Petroleum Corp.*, 105 Cal. App. 737 [288 Pac. 721], it was said: ''From the foregoing authorities it appears that the deposits of oil involved was a part of the land in which it was found; that Lake's right to extract the oil was 'private property', a claim to land, although not accompanied by actual physical possession of the subterranean deposit'; that such claim was 'founded on a right' vested in him by the terms of the lease, a right 'coupled with an interest'. While the oil in its natural deposit was a part of the land, it was in actual existence as part of the land and was potentially personal property under the terms of the lease and actually became personal property to the extent of the amount thereof involved in this action when the lessee exercised his right to extract it.''

From the foregoing authorities we have not hesitated to conclude that the interest of the lessee of the leased property under an oil lease differs materially from and is much greater than the interest of the tenant under the ordinary usufructuary lease. ▮ The grant of the tide and overflowed lands from the state to the city of Venice was made in 1917 and oil was not discovered in or near this city until 1929. In giving to the city of Venice the right to *lease* this property we do not believe the legislature had in mind or contemplated the leasing of the property for the drilling for and the production of oil which at the time no one had any idea existed under the ocean nor did it intend that the property be leased for any purposes other than those usually incident to the development of a harbor. This conclusion is strengthened by the clause in the act which prohibits the grant, conveyance, giving away or alienation of any part of the tide or submerged lands. The natural and necessary effect of an oil lease coupled with the discovery of

oil is the alienation of a part of the freehold. As we have observed the oil in place is a part of the realty. When it is brought to the surface it becomes personalty and a part of it is the property of the lessee. Thus a sale of a part of the freehold is effected by devious and indirect means, but it is just as much a sale as though the city should convey the oil in place to the oil operator who proposes to lease the premises. Such a sale is expressly prohibited by the act granting the property to the city of Venice.

It remains for us to consider whether or not an injunction will lie to prevent the execution of the proposed oil lease, for the reason, as maintained by appellants, that it involves an exercise of the legislative functions by the officials of the City of Los Angeles. If it does, the injunction must be refused, for under our government as formed, the legislative branches must function independent of direct interference by the courts in the performance of strictly legislative acts. For good and sufficient reasons the courts may on proper occasion nullify the effects of an illegal legislative act but they do not prevent the passage of an act. This is not true of an administrative or ministerial act of an officer of a city who attemps to act in excess of his legal authority or to perform an act which is contrary to law. (*Yarnell* v. *City of Los Angeles,* 87 Cal. 603 [25 Pac. 767] ; *County of Modoc* v. *Spencer & Raker,* 103 Cal. 498 [37 Pac. 483] ; *Ertle* v. *Leary,* 114 Cal. 238 [46 Pac. 1] ; *Hughson* v. *Crane,* 115 Cal. 404 [47 Pac. 120] ; *Smeltzer* v. *Miller,* 113 Cal. 163 [45 Pac. 264] ; Id., 125 Cal. 41 [57 Pac. 668] ; *Vallejo Ferry Co.* v. *City of Vallejo,* 146 Cal. 392 [80 Pac. 514] ; *Crowe* v. *Boyle,* 184 Cal. 117 [193 Pac. 111] ; *People* v. *Hawley,* 207 Cal. 395 [279 Pac. 136] ; *Chapman* v. *City of Fullerton,* 90 Cal. App. 463 [265 Pac. 1035].)

Under the provisions of the charter of the City of Los Angeles the Department of Playground and Recreation cannot execute the proposed oil lease unless authorized so to do by an ordinance passed by the city council. Were the passage of such an ordinance involved in this case, or enjoined by the court below, we would be compelled to hold that the courts have no power to enjoin the passage of an ordinance by the legislative body of a municipality. (Sec. 526, Code Civ. Proc.; sec. 3423, Civ. Code.) We have as-

sumed that the stipulation of counsel waived proof of the passage of such an ordinance by the city council. We construe the injunction granted in the court below as merely restraining the commissioners and officers of the Department of Playground and Recreation of the City of Los Angeles from executing the proposed oil lease. The execution of such a lease is an administrative act and not a legislative one. The legislative powers of the city are vested in the city council and not in the Department of Playground and Recreation. The execution of the proposed lease being an administrative act beyond the powers of the commissioners of the Department of Playground and Recreation and not authorized by the act granting the property in question to the city of Venice and in violation of the trusts upon which the state ceded the lands to the city, the injunction was properly granted in the court below.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 8, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 16, 1931.