[No. A102773. First Dist., Div. Four. Feb. 26, 2004.]

CITIZENS FOR BETTER STREETS et al., Plaintiffs and Appellants, v. BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

COUNSEL

Paul Ferdinand Utrecht, Andrew Mayer Zacks and Eric D. McFarland for Plaintiffs and Appellants.

Andrew William Schwartz, Dennis J. Herrera and Susan Cleveland-Knowles for Defendants and Respondents.

OPINION

**SEPULVEDA, J.**—Plaintiffs Citizens for Better Streets (Citizens) and Richard Wall brought this taxpayers' action to enjoin an alleged unlawful use of public property by the Board of Supervisors, Mayor, and Planning and Housing Directors of the City and County of San Francisco (collectively, City). Plaintiffs contend that defendants have threatened to act unlawfully by proposing to lease for purposes of low-income housing portions of the former right-of-way of the Embarcadero Freeway, which was demolished in the aftermath of the 1989 Loma Prieta earthquake. Plaintiffs contend that under Streets and Highways Code section 72 (section 72), by which the State of California granted these lands to the City, the City was required either to build roads upon the affected lands or to sell them at market value and apply the proceeds to road building. The trial court denied plaintiffs' motion for a preliminary injunction, finding among other things that plaintiffs were not likely to prevail on the merits. We will affirm that order.

## BACKGROUND

It is undisputed that the earthquake of October 1989 damaged Route 480, a freeway in San Francisco commonly known as the Embarcadero Freeway. On October 7, 1991, the Legislature enacted section 72 to prescribe the respective duties of the Department of Transportation and the City with respect to the demolition and replacement of the freeway. The Department of Transportation was obligated to (1) demolish the damaged freeway; (2) transfer the right-of-way to the City, retaining such portion as was "necessary for new ramps"; and (3) "[j]ointly agree with the City . . . on a system of ramps and city streets that would essentially provide motorists with accessibility comparable to that provided" by the demolished freeway. (§ 72, subd. (a)(1)–(3).) The City was obligated, among other things, to "[c]onstruct the system of ramps and city streets and *utilize the Route 480 right-of-way or the proceeds from sales of that right-of-way for the sole purpose of constructing an alternate system of local streets pursuant to paragraph (3) of subdivision (a)*." (§ 72, subd. (b)(1), italics added.) The bill enacting section 72 also removed Route 480 from the state highway system and had various other effects not at issue here. (Stats. 1991, ch. 498, §§ 2–8.)

In December 1994, the state conveyed the Route 480 right-of-way to the City pursuant to an agreement reciting that the conveyance was made "[p]ursuant to Section 72 of the Streets and Highways Code." The agreement noted that the statute required the City to "construct a system of ramps and City streets utilizing the Route 480 right-of-way or the proceeds from the sale of that right-of-way for the sole purpose of constructing an alternate system of local streets as above described." Thereafter the City, the state, and the

Federal Highway Administration apparently developed a project for a replacement street system, known as the Mid-Embarcadero Roadway Project, which was analyzed in a combined environmental impact statement and environmental impact report (the EIS/EIR), which was certified by the San Francisco Planning Commission on September 12, 1996.

On January 11, 1999, the San Francisco Board of Supervisors (Board) adopted resolution No. 27-99,[1] "approving in principle" the disposition of three parcels of a former freeway right-of-way designated as Broadway parcels 1, 2, and 3. The Board declared its intention to transfer parcel 1 to the San Francisco Police Department, parcel 3 to the Port of San Francisco, and parcel 2—the property here at issue—to the Mayor's Office of Housing (MOH) "for the development of affordable housing . . . including but not limited to the issuance of requests for qualifications and/or proposals for a developer to purchase or lease of [sic] the site at less than fair market value for the development of affordable housing." The January 11, 1999 resolution recited that the loss of the freeway had "impacted the social and economic viability of the Chinatown and North Beach Communities" and that the "proposed uses of the Broadway Parcels are intended to mitigate the effects of that demolition." The resolution also noted a statutory "priority" under Government Code sections 54220 et seq. for "the disposition of surplus City property, such as Broadway Parcel 2, at less than fair market value for affordable housing development," and declared that the proceeds from the proposed dispositions, including "the sale or lease of Broadway Parcel 2 at less than fair market value for the development of affordable housing, would provide the City with significant resources for the improvement of local street access comparable to that provided by the former Embarcadero Freeway, while enhancing the feasibility of developing such affordable housing." It was further resolved that any proceeds from these dispositions "shall be used in accordance with the requirements imposed by Streets & Highways Code Section 72, to the extent such proceeds are deemed necessary by the City's Waterfront Transportation Project to fulfill the City's obligation under that Section to provide local street access comparable to that provided by the former Embarcadero Freeway."

According to respondent, the January 11, 1999 resolution gave birth to what became known as the Broadway II Affordable Housing Project. On January 31, 2000, the MOH entered into an exclusive negotiating agreement for the development and construction of the project with ChinatownCDC (CCDC), a nonprofit housing and community development corporation. The City and CCDC thereafter spent substantial amounts of time and money in predevelopment activities. In November 2001, the mayor approved a loan to

---

[1] The parties refer to this document as either an ordinance or a resolution; we use the term "resolution" in accordance with the record.

CCDC of $92,500 for predevelopment costs. On November 20, 2002, the mayor approved loans totaling $10,150,000 for development of the project. By January 2003, the City and CCDC had negotiated a lease disposition and development agreement under which CCDC would lease the property for 50 years at a below-market rate of $10,000 per year, but apparently including an option for an additional 49 years.[2]

On December 6, 2002, Citizens and Wall brought this action.[3] Their complaint alleged an "illegal and wasteful expenditure of property" consisting of the City's proposal to lease the property for 50 years at $10,000 per year. Plaintiffs alleged that the city was currently deriving revenues from the property of over $11,000 per month, largely from parking lots then occupying two-thirds of the area of the parcels in question, that the fair market value of the property was more than $9 million, and that the fair value of a 50-year lease was "more than $700,000 per year." Plaintiffs alleged that the proposed lease violated both section 72 and the terms of the state's grant. Plaintiffs prayed for preliminary and permanent injunctions restraining defendants from "wasting the property and revenues of the City by illegally leasing the Property for a purpose for which it was not intended at a rate below market value."

Plaintiffs moved for a preliminary injunction. In opposition, the City presented a declaration to the effect that as of January 2003, the project had been "[e]ssentially . . . completed" in satisfaction of the City's obligations under section 72, that the responsible City department was "in the process of closing out" the project with the responsible state and federal agencies, and that "[f]unds from the below-market lease of the Broadway II parcel will be paid to [the responsible City department] and will be used for the Roadway Project." The City has also asked this court to take judicial notice of a Board resolution of September 23, 2003, reciting that the Mid-Embarcadero Roadway Project has been paid for out of federal and state grants and a loan from the San Francisco Transportation Authority of which the City's Department of Public works is obligated to repay $5.6 million. The September 23, 2003 resolution further recites that the funds received from the housing project lease, as well as from the sale of other former freeway parcels, will be applied to and will satisfy this obligation.

On March 24, 2003, the trial court denied plaintiffs' motion for a preliminary injunction. It found that plaintiffs had not demonstrated a probability

---

[2] According to materials included in the City's request for judicial notice, the agreement ultimately approved by the City on September 26, 2003, provides for a 65-year initial term with a right to extend for 34 additional years.

[3] Defendants assert that Citizens is "[a]pparently . . . merely Richard J. Wall's alter ego." We do not find it necessary to evaluate this assertion.

that they would prevail on the merits, because "[t]he City has complied with the requirements of Section 72." It also found that "[t]he balance of harms, including consideration of laches, weighs in favor of the City, the public, and the ChinatownCDC."

Plaintiffs filed a notice of appeal on May 22, 2003.

## DISCUSSION

■ A plaintiff seeking a preliminary injunction bears the burden of presenting facts which show a reasonable probability that he will succeed on the merits. (*Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356 [125 Cal.Rptr.2d 383].) When the trial court denies the requested relief, the plaintiff bears the burden, as appellant, of overcoming the presumption of correctness which attends the challenged ruling. (*Id.* at p. 357.) Here the dispositive question is whether plaintiffs have carried their burden, as appellants, of showing that the trial court erred in finding that they had not demonstrated a reasonable probability of success on the merits.

■ Ordinarily, the trial court's grant or denial of a preliminary injunction is reviewed for abuse of discretion. (*Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 512 [21 Cal.Rptr.2d 578].) However, where the ruling depends on the construction of a statute, it is to that extent reviewed de novo. (*Ibid.*) Here the trial court denied plaintiffs' motion in part on the ground that plaintiffs were not likely to succeed on the merits because their claims depended on an interpretation of section 72 which was unlikely to be sustained. We review this determination de novo.

Plaintiffs' argument rests on the requirement imposed by section 72 that the City shall "utilize the Route 480 right-of-way or the proceeds from sales of that right-of-way for the sole purpose of constructing an alternate system of local streets pursuant to paragraph (3) of subdivision (a)." (§ 72, subd. (b)(1).) Plaintiffs contend that this language required the City either to build the replacement project on the property, or to sell it *at market value* and apply the proceeds to "road construction."

Nothing in the statute requires a sale at market value, or on any other particular terms. Plaintiffs' argument obliquely *implies* such a requirement. But "[a]n intention to legislate by implication is not to be presumed." (*Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist.* (1986) 185 Cal.App.3d 996, 1002 [230 Cal.Rptr. 225].) Plaintiffs have failed to show that the implication on which their argument rests is *necessarily* derived from the statute. (See *Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 529 [53 Cal.Rptr.2d 24].)

■ By its terms the statute requires the City either to use the parcels in question to build an "alternate system of local streets" to replace the demolished freeway (i.e., the Replacement Project), or to apply the proceeds of any sale of those parcels to financing that specific project. So far as this record shows, the City has complied with these conditions. The City did not use the parcels as an actual site for the project, but it *has* adopted a resolution stating that the proceeds from their disposition will be applied to pay for the project.[4] The City's proposed actions therefore appear to comply with the letter of section 72.

Plaintiff's arguments rest on the City's supposed contravention of the *purpose* of section 72, by leasing the property, for a purpose other than road construction, at a price below fair market value. But again, the statute says nothing about the terms on which a disposition must be made, only that the proceeds must be applied to the Replacement Project. The statute might conceivably be read to *imply* a requirement of fair market value if, as plaintiffs contend, it required the proceeds of sale to be applied to "road construction" or "streets and roads" *in general*. But plaintiffs are simply in error when they assert that the statute contains an "express requirement that the Property or its sale proceeds be used for the sole purpose of constructing streets and roads. . . . [W]hen the Legislature granted [the] Property to the City, the intent was to build roads . . . ." The statute does not require the City to create a fund for "streets and roads"; indeed it does not permit the City to spend the proceeds of sale on construction of "streets and roads" other than those comprising the Replacement Project, i.e., the "alternate system of local streets *pursuant to paragraph (3) of subdivision (a)*." The italicized language refers unequivocally to the Replacement Project. (See § 72, subd. (a)(3).) Thus the only purpose contemplated by section 72 is the construction of the Replacement Project itself.

This reading of the plain terms of the statute is echoed in the sources plaintiffs cite for their own interpretation. Thus the Legislative Counsel's Digest for the bill which became section 72 merely restates the requirement that "San Francisco . . . utilize the Route 480 right-of-way, or the proceeds from the sale of the right-of-way, to construct *an alternate system of local streets*." (Stats. 1991, ch. 498 §§ 2–8, italics added.) Plaintiffs' position is also contradicted by the statement they quote from an environmental impact report jointly submitted

---

[4] We note that the City is not proposing to *sell* the parcel at all, but rather to lease it. Neither party makes much of this fact. Defendants contend that a 99-year lease is economically equivalent to a sale and therefore does not offend the statute. Plaintiffs conceded below that a long-term lease would probably not violate the statute *if it called for market rents*. Yet at oral argument before this court, counsel asserted that plaintiffs do contest the legality of a lease, even at market rates. Because plaintiffs have offered no distinct argument on this point, they have failed to show that they would probably prevail on this issue on the merits.

by local, state, and federal authorities, which states that section 72 requires the proceeds from sales of the right-of-way to be used for "the current project."

Plaintiffs also invoke article 19 of the California Constitution, which governs the utilization of gasoline tax proceeds and properties acquired with those proceeds. The trial court sustained an objection to plaintiffs' citation of these provisions on the ground that they were first asserted in plaintiffs' reply memorandum. But assuming the point is properly before us, we are directed to no evidence which would make those provisions applicable to this case. Article 19 applies largely, if not exclusively, to property purchased with gasoline tax revenues or vehicle license fees. (See Cal. Const., art. XIX, §§ 1, 2, 8.) So far as we have discovered, plaintiffs made no effort to demonstrate that the properties here were actually purchased with such revenues. Plaintiffs' argument simply assumes that the constitutional provisions apply. The argument therefore fails for lack of necessary factual support.[5]

Plaintiffs also point to a 1993 report prepared by certain agencies of the City, containing the opinion that an arrangement "giv[ing] up" portions of the freeway right-of-way at below-market cost for purposes of low-income housing would " 'clearly conflict with the basic purpose of the land transfer.' " Plaintiffs do not suggest that this court—or the City—is bound by this opinion. As we have stated, it is our view that the purpose of the transfer, as manifested in section 72, was to condition the conveyance of these properties on the construction of a replacement system of ramps and streets, and to provide adequate land and funding to ensure that end. In 1993 these conditions remained to be fulfilled: no replacement project had been built, and presumably the authors of the report could not know whether adequate funding for the project would otherwise be obtained. Thus, whatever persuasive value these opinions might otherwise have possessed, we can give them little weight today, ten years later, when the replacement system is in place and will be fully paid for without selling all of the parcels at market value.

Defendants devote considerable energy to demonstrating the need for affordable housing in San Francisco. We agree with plaintiffs that this demonstration is beside the point. As plaintiffs state, the principal issue here is whether section 72 "permits Defendants to use property that was formerly part of the Route 480 right-of-way . . . for a purpose wholly unrelated to road construction." The answer to this question is plainly affirmative: the property can be used for any purpose whatsoever, provided that (1) the proceeds from its disposition are applied to the construction of a replacement system of

---

[5] Perhaps this is why appellants, in their reply brief, note that "[i]n this appeal, Citizens do not contend that the lease violates the California Constitution per se. Rather . . . Citizens contend that Article XIX should be considered when interpreting § 72."

ramps and streets, and (2) such a system is in fact constructed. Since the present record indicates that both of these conditions have been or will be fulfilled, there is no present likelihood that plaintiffs will prevail on the merits.[6] This makes it unnecessary to consider the alternative grounds on which the City contends the trial court's ruling may be sustained.[7]

## DISPOSITION

The order of the trial court denying plaintiff's motion for a preliminary injunction is affirmed.

Rivera, J., concurred.

**KAY, P. J.**—I respectfully dissent.

The statute by which the land was conveyed to the City requires that the property, or the proceeds of its *sale*, be used for the *sole purpose* of building a system of alternate streets to take the place of the Embarcadero Freeway that collapsed during the earthquake. The City maintains that it has complied with both the spirit and the letter of the statute. The majority agrees. I do not. The City maintains, and the trial court impliedly found, that neither the property nor the sales proceeds therefrom are needed for the project for which the property was conveyed nor to repay the $5.6 million loan incurred by the City to complete it. For purposes of this appeal appellant concedes that the trial court did not abuse its discretion as a fact finder.[1] In making this concession, appellant has pared the issue down to this single question: Is the City free to use or cause the property to be used for housing? I believe the answer to that question is it may not do so without legislative approval.

The City has structured a long-term lease to a private commercial developer that it maintains is the "sale" referred to in section 72. If so, it is a "sale"

---

[6] We note that the fulfillment of these conditions appears in this record only by virtue of the September 23, 2003 Board resolution so reciting. However, counsel for plaintiffs conceded at oral argument that plaintiffs do not dispute, for purposes of this appeal, that (1) the project has been completed and (2) the proceeds from the disposition of the CCDC parcel, and other former freeway parcels, will be applied to retire the remaining debt for the project, and will be adequate to that purpose. Accordingly, we have no occasion to address the sufficiency of the evidence supporting those findings.

[7] We also find it unnecessary to address the question of the "balance of harms" in view of plaintiffs' assertion that this issue "is not germane to . . . this appeal."

[1] There does not appear to be any specific evidence in the record to support the trial court's implied finding regarding the adequacy of funds to repay the debt from future sales of the other two properties to the police department and the port authority. Nor is it clear to me how transfers of properties from one city agency to another, presumably generating no new money, will enable the debt to be repaid. The point is in any event moot in light of my conclusion that the City has no authority to use the property except in compliance with the express terms of section 72.

for approximately five percent of the value of the property. It follows that the City is making a gift of the other 95 percent of the value. The majority concludes that because the project contemplated by the statutory grant has been completed, there is no reason to "read into" section 72 a fair market value requirement. In effect, the majority reads into the section the right of the City to make a gift of the land to a developer for a purpose which, praiseworthy or not, is stunningly different from that purpose for which the land was conveyed to the City.

More than 90 years ago a California court stated the rule followed throughout the country that "where a grant [of real property] is made for a specified, limited, and definite purpose, the subject of the grant cannot be used for another and a different purpose." (*Mulvey v. Wangenheim* (1913) 23 Cal.App. 268, 271 [137 P. 1106]; accord, *Marshall v. Standard Oil Co.* (1936) 17 Cal.App.2d 19, 27 [61 P.2d 520]; see *Woman's Hospital League v. City of Paducah* (1920) 188 Ky. 604 [223 S.W. 159, 161–162] and authorities cited). The principle is closely akin to the rule that property dedicated for a specific public use cannot be used for other purposes. (E.g., *Wattson v. Eldridge* (1929) 207 Cal. 314, 320 [278 P. 236]; *Archer v. Salinas City* (1892) 93 Cal. 43 [28 P. 839]; *Hall v. Fairchild-Gilmore-Wilton Co.* (1924) 66 Cal.App. 615 [227 P. 649]; *Mulvey v. Wangenheim, supra,* at p. 271; 11A McQuillin, Municipal Corporations (3d rev. ed. 2000) § 33.74, pp. 524–525.) Although not cited by the parties, there is precedent that deals with a situation similar to the one we address here. In 1917 the Legislature granted the City of Venice tidelands within the city's boundaries to " 'be used by said city . . . solely for the establishment, improvement, and conduct of a harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation . . . provided, that said city, or its successors . . . may lease said lands . . . for purposes consistent with . . . the requirements of commerce or navigation at such harbor. . . .' " (*Stone v. City of Los Angeles* (1931) 114 Cal.App. 192, 194–195 [299 P. 838].) A dozen years later, after Venice had consolidated with the City of Los Angeles, oil was discovered near the shoreline. The city proposed to lease the tidelands to permit commercial drilling and extraction. A taxpayer successfully sued to enjoin the lease, a conclusion that was affirmed on appeal. The court stated, "In giving to the city of Venice the right to *lease* this property we do not believe the legislature had in mind or contemplated the leasing of the property for the drilling for and the production of oil . . . nor did it intend that the property be leased for any purposes other than those usually incident to the development of a harbor." (*Id.* at p. 203.) The situation here is not appreciably different. The Legislature transferred the property to the City for the sole purpose of facilitating the flow of traffic disrupted by the Loma Prieta earthquake. "[F]or the sole purpose of constructing an alternate system

of local streets. . . ." the City could either "utilize the Route 480 right-of-way," or "utilize . . . the proceeds from sales of that right-of-way . . . ." (§ 72, subd. (b)(1).) The City has done neither. Instead, the City intends to cause the property to be used in a manner completely unrelated to the problem of vehicular traffic that motivated the Legislature to make the grant. The operative words of section 72 are "sale" and "sole purpose." These are words of plain meaning, and there is no indication that the Legislature in employing them intended a different meaning. (E.g., *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 493 [59 Cal.Rptr.2d 20, 926 P.2d 1114]; *Stone v. City of Los Angeles, supra,* at p. 198.) Indeed, when section 72 was under consideration as Senate Bill No. 181, it was described in the Legislative Counsel's Digest as follows: "The bill would impose a state-mandated local program by requiring San Francisco to utilize the Route 480 right-of-way, or proceeds from sale of the right-of-way, to construct an alternate system of local streets." (See Legis. Counsel's Dig., Sen. Bill No. 181, 4 Stats. 1991 (1991–1992 Reg. Sess.) Summary Dig., p. 207.)

"In construing a statute, our role is limited to ascertaining the Legislature's intent so as to effectuate the purpose of the law. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000 [90 Cal.Rptr.2d 236, 987 P.2d 705]; *People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) We look first to the words of the statute because they are the most reliable indicator of legislative intent. (*In re J.W.* (2002) 29 Cal.4th 200, 209 [126 Cal. Rptr. 2d 897, 57 P.3d 363].) If the statutory language on its face answers the question that answer is binding unless we conclude the language is ambiguous or it does not accurately reflect the Legislature's intent. (*People v. Broussard* (1993) 5 Cal.4th 1067, 1071–1072 [22 Cal.Rptr.2d 278, 856 P.2d 1134]; *Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; see *Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].)" (*Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1271 [135 Cal.Rptr.2d 654, 70 P.3d 1067].) The meaning of the statute was clear enough to the City in 1993, two years after it was enacted. Then, seven different city agencies issued a report addressing the issue raised in this appeal. That report was prepared by the Waterfront Transportation Projects Office and Office of the Chief Administrative Officer in association with the Department of City Planning, Department of Parking and Traffic, Department of Public Works, Department of Real Estate and the San Francisco Redevelopment Agency. The report considered the need for low-cost housing but concluded that "this kind of disposition would clearly conflict with the basic purpose of the land transfer." (*Mid-Embarcadero Roadway Replacement Project: Recommendations on Disposition of Broadway Parcels* (March 1993) p. 11.) That conclusion was correct and remains so whether or not the City believes that it needs the property for that purpose. The intended use that appellant seeks to enjoin is plainly "another and different purpose" (*Mulvey v.*

*Wangenheim, supra*, 23 Cal.App. 268, 271), and is therefore ultra vires to the Legislature's grant and to section 72.

In conclusion, because the City has wrongly assumed that the property may be used for any purpose it wishes without the consent of the Legislature, provided only that it is not needed for the one for which it was conveyed, I would reverse.

Appellants' petition for review by the Supreme Court was denied June 9, 2004. Baxter, J., was of the opinion that the petition should be granted.