[No. A113933. First Dist., Div. Four. Aug. 11, 2006.]

JACK O'CONNELL, as Superintendent of Public Instruction, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
LILIANA VALENZUELA et al., Real Parties in Interest.

1456

■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

COUNSEL

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, James M. Humes, Chief Assistant Attorney General, Thomas R. Yanger, Assistant Attorney General, Douglas M. Press, Kara Read-Spangler, Hadara R. Stanton and Karin S. Schwartz, Deputy Attorneys General, for Petitioners.

Allan Zaremberg for California Chamber of Commerce, California Business Roundtable and California Business for Education Excellence as Amici Curiae on behalf of Petitioners.

Raneene Rae Belisle for Las Familias del Pueblo as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Morrison & Foerster and Arturo J. González, Shane Brun, Vanina Sucharitkul, Chris J. Young and Johanna Hartwig for Real Parties in Interest.

Public Advocates, John Affeldt, Jenny Pearlman and Tara Kini for Campaign for Quality Education, Asian/Pacific Islander Youth Promoting Advocacy and Leadership, California Association of Community Organizations for Reform Now, Californians for Justice, California Tomorrow, Coalition for Educational Justice, Community Asset Development Redefining Education, Justice Matters, Parents for Unity, United Teachers Los Angeles, Youth in Focus and Youth Together as Amici Curiae on behalf of Real Parties in Interest.

Melissa W. Kasnitz for Disability Rights Advocates as Amicus Curiae on behalf of Real Parties in Interest.

Opinion

RUVOLO, P. J.—

## I.

## INTRODUCTION

By order of the California Supreme Court, we are charged with reviewing defendants'[1] petition for writ of certiorari, mandate, and other appropriate relief, challenging a preliminary injunction issued by the Alameda County Superior Court, but later stayed by the California Supreme Court. That injunction restrained defendants from denying diplomas to members of the 2006 graduating class at California public high schools who were otherwise eligible to graduate, but who had not passed both portions of the California high school exit exam, otherwise known as the CAHSEE.

We conclude, inter alia, that: (1) the trial court's determination that plaintiffs were likely to prevail on their primary equal protection claim was supported by substantial evidence and legally proper, although the court's determination as to their secondary claim was not; (2) the trial court abused its discretion in the manner in which it balanced the factors it was legally required to consider in deciding a motion for preliminary injunction, and in concluding that the injunction was necessary in order to maintain the status quo while the underlying litigation proceeded; and (3) the remedy exceeded what the court had the legal authority to impose, and was otherwise overbroad in its scope. Accordingly, we grant defendants' writ petition, and vacate the preliminary injunction.

## II.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The historical background facts relevant to this litigation are largely a matter of public record, and are not in dispute. In March 1999, the California Legislature found that "[l]ocal proficiency standards" set by individual school districts were "generally set below a high school level and [were] not consistent with state adopted academic content standards." (Stats. 1999, 1st Ex. Sess. 1999–2000, ch. 1, § 1(a).) The Legislature concluded that "[i]n

---

[1] For simplicity and clarity, we will refer to the petitioners in this writ proceeding, who were the defendants and respondents in the trial court, as defendants, and to the real parties in interest, who were the plaintiffs and petitioners in the trial court, as plaintiffs.

order to significantly improve pupil achievement in high school and to ensure that pupils who graduate from high school can demonstrate grade level competency in reading, writing, and mathematics, the state must set higher standards for high school graduation." (Stats. 1999, 1st Ex. Sess. 1999–2000, ch. 1, § 1(b).)

■ In order to further this goal, the Legislature directed that defendant "Superintendent of Public Instruction, with the approval of [defendant] State Board of Education, shall develop a high school exit examination in English language arts and mathematics in accordance with . . . statewide academically rigorous content standards adopted by [defendant] State Board of Education . . . ." (Ed. Code, § 60850, subd. (a).)[2] The examination developed under that mandate has come to be known as the CAHSEE. The CAHSEE is administered to all public high school students starting in grade 10, and each student is permitted to continue to take the CAHSEE at each subsequent administration, several times a year, until he or she has passed both sections. (§ 60851, subd. (b).) School districts are required to offer "supplemental instructional programs for pupils . . . who do not demonstrate sufficient progress toward passing the [CAHSEE]." (§ 37252, subd. (a); see also § 60851, subd. (f).)

The legislation creating the CAHSEE provided that passage of the examination would be required as a condition of a student's receipt of a high school diploma (the CAHSEE diploma requirement). (§ 60851, subd. (a).) Originally, the Legislature directed that the CAHSEE diploma requirement take effect commencing with the 2003–2004 school year. (*Ibid.*) In 2001, however, the Legislature gave defendant State Board of Education the authority, at any time prior to August 1, 2003, to delay implementation of the CAHSEE diploma requirement if it determined, based on an independent study mandated by the legislation, that "the test development process or the implementation of standards-based instruction [did] not meet the required standards for a test of this nature." (§ 60859, subd. (a); see Stats. 2001, ch. 716, § 3.) As permitted by this legislation, defendant State Board of Education determined in July 2003 not to impose the CAHSEE diploma requirement on students graduating prior to the spring of 2006. A motion to defer the requirement for one additional year, until 2007, failed by one vote.

Since the start of the 2000–2001 school year, school districts have been required to notify their students' parents or guardians annually about the CAHSEE diploma requirement. (§ 48980, subds. (a), (e); see Stats. 1999, 1st Ex. Sess. 1999–2000, ch. 1, § 3 [amending § 48980, subd. (e), to require notification regarding CAHSEE diploma requirement].) Accordingly, at least since July 2003, it has been a matter of public record that students scheduled

---

[2] All further references to statutes are to the Education Code unless otherwise noted.

to graduate from high school in the spring of 2006 (the class of 2006) would be required to pass the CAHSEE in order to receive their diplomas.

In May 2000—shortly after the legislation creating the CAHSEE went into effect—the same law firm that represents plaintiffs in this action filed a class action on behalf of public school students against the State of California (the *Williams* litigation), charging the state with "failing to meet its constitutional obligation to provide students with fundamentally equal educational opportunity, focusing on dramatic inequalities in access to instructional materials, adequate learning facilities, and qualified teachers." In August 2004, the state agreed to settle the *Williams* litigation, and as part of that agreement, passed several pieces of legislation providing for improvements in the provision of teaching materials, clean and safe facilities, and qualified teachers to all California students. It was not until March 2005, however, that the superior court judge who presided over the *Williams* settlement entered a final order approving its terms, and it is undisputed that the improvements in educational equality required under the *Williams* settlement had not yet been fully implemented by the time the CAHSEE diploma requirement became effective.

The skills tested on the CAHSEE are neither esoteric nor highly advanced. To pass, a student need only be able to achieve a 60 percent score on a test of up to 10th grade English language skills, and a 55 percent score on a test of math skills at up to a 7th grade level, plus algebra. Nonetheless, only 69 percent of the students in the class of 2006 were able to pass both sections of the CAHSEE when they first took it in February 2004, while they were in the 10th grade. By January 2006, the aggregate pass rate for the class of 2006 had improved to 89 percent.[3] Significant differences remained, however, between the overall pass rate and the pass rates for Hispanics (82 percent), African-Americans (80 percent), economically disadvantaged students (82 percent), and English learners (69 percent).

In the fall of 2005, with the implementation of the CAHSEE diploma requirement scheduled to occur at the end of the current school year, the Legislature appropriated $20 million in supplemental funding (the supplemental funding) for school districts with the highest percentage of students in the class of 2006 who had not yet passed the CAHSEE. The statute appropriating the money specified that it was to be distributed by ranking schools on the basis of the percent of their students in the class of 2006 who had not yet passed the CAHSEE, and then distributing $600 per pupil to the

---

[3] Plaintiffs contend that this figure, and other pass rates reported by defendants, is inflated, because they are computed against a denominator that excludes students who dropped out of high school. Nonetheless, it does not appear to be disputed that the CAHSEE pass rate for the class of 2006 rose significantly over time.

school districts in which those schools were located, in the order determined by defendant Superintendent of Public Instruction, until the funds were exhausted. (Former § 37254.) The result of this legislative directive was that all of the supplemental funding went to school districts containing schools in which 28 percent or more of the class of 2006 had not yet passed the CAHSEE. School districts in which none of the schools had a CAHSEE failure rate of at least 28 percent did not receive any of the supplemental funding, no matter how many students in those districts had not passed.

The legislation creating the CAHSEE required defendant State Board of Education, in consultation with defendant Superintendent of Public Instruction, to "study the appropriateness of other criteria by which high school pupils who are regarded as highly proficient but unable to pass the [CAHSEE] may demonstrate their competency and receive a high school diploma." (§ 60856.) The parties disagree as to whether a study complying with this mandate was performed, but it is not disputed that no "other criteria" for receiving a diploma were adopted before the class of 2006 was to graduate.

By the time the results of the February 2006[4] administration of the CAHSEE were released, the percentage of the class of 2006 that had passed both sections had increased slightly, to 89.3 percent. Nonetheless, at that point there remained almost 47,000 members of the class of 2006—about 10 percent—who had yet to pass at least one section of the CAHSEE, and who therefore were at risk of not receiving their diplomas at the expected time, if they did not succeed in passing it at the March or May administration.[5]

On February 8, plaintiffs initiated this litigation by filing, in the San Francisco Superior Court, a verified petition for writ of mandate and complaint for declaratory and injunctive relief. The complaint was framed as a class action on behalf of "those high school students in California public schools who are scheduled to graduate with the [c]lass of 2006 and who have satisfied all of their requirements for graduation except for passing the

---

[4] All further references to dates are to the year 2006 unless otherwise noted.

[5] At defendants' request, we have taken judicial notice of the results of the March and May CAHSEE administrations, which were released after the trial court issued the injunction under review. By the March administration, 90 percent of all students in the class of 2006 had passed. Nearly 42,000 students, however, remained at risk of failing to graduate because of the CAHSEE diploma requirement. On July 21, defendants announced that an additional 1,759 members of the class of 2006 had passed the CAHSEE in May, and defendants' counsel indicated at oral argument that students in this group who have met all the other requirements for graduation will receive their diplomas in due course. Nonetheless, as of July 21, over 40,000 members of the class of 2006—a little more than 9 percent—still had not passed the CAHSEE. Moreover, the pass rates for certain categories of students remained considerably lower than the overall rate: about 85 percent for Hispanics, 83 percent for African-Americans, 86 percent for economically disadvantaged students, and 77 percent for English learners.

[CAHSEE]."[6] The complaint alleged that defendants had (1) deprived plaintiffs of their fundamental right to a public education by denying plaintiffs their high school diplomas; (2) violated the equal protection clause of the California Constitution by failing to provide plaintiffs with an equal opportunity to pass the CAHSEE, unfairly allocating the supplemental funding, and disadvantaging English learners; (3) violated their statutory duty to conduct a good faith study of alternatives to the CAHSEE; and (4) deprived plaintiffs of their property interest in obtaining their high school diplomas without due process. The complaint also included a prayer for declaratory relief, framed as a separate cause of action.

On March 17, defendants demurred to the complaint. On March 23, plaintiffs filed a motion for preliminary injunction, supported by voluminous declarations and exhibits. The motion sought an injunction "preventing [d]efendants from requiring students in California's [c]lass of 2006 to pass the [CAHSEE] as a condition of graduation."

On March 30, while the demurrer and the motion for preliminary injunction were still pending, Judge Ronald Sabraw of the Alameda County Superior Court entered an order coordinating this case with the *Kidd* action, and recommending Alameda County as the venue for the coordinated case. This case was then transferred to the Alameda County Superior Court, and assigned to Judge Robert Freedman as coordination trial judge.

---

[6] No plaintiff class has yet been certified. Nonetheless, purely for convenience, we will use the term "plaintiff class members" to refer to students in the class of 2006 who completed all the requirements to graduate from high school on schedule, except for passing either or both sections of the CAHSEE.

In plaintiffs' complaint, the proposed class was defined to exclude students who were members of the plaintiff class in a separate, pending action on behalf of students with disabilities, *Kidd v. California Department of Education* (Super. Ct. Alameda County, No. 2002049636) (the *Kidd* action). By the time plaintiffs filed the instant litigation, urgency legislation had been passed deferring application of the CAHSEE diploma requirement to students with disabilities for one year, and permitting such students in the class of 2006 to graduate and receive a diploma even if they did not pass the CAHSEE or obtain a waiver. (§ 60852.3, eff. Jan. 30, 2006, repealed eff. Dec. 31, 2006; see Stats. 2006, ch. 3, § 2.) The *Kidd* action remains pending in the Alameda County Superior Court, and is one of the actions with which this litigation has been coordinated.

Even though the definition of the proposed plaintiff class in the present action excluded members of the plaintiff class in the *Kidd* action, the trial court's injunction in the present case did not contain any exception for those students. In light of the Supreme Court's stay of the injunction, any issue arising from that omission may be moot, and in any event, in light of our disposition of the merits, we need not address the issue. Moreover, it goes without saying that nothing in this opinion is intended to affect either the cited legislation, or any relief granted or other order entered in the *Kidd* action.

On April 19, the trial court overruled defendants' demurrer in all respects except as to the State of California's demurrer to the cause of action for mandamus relief. Defendants filed their opposition to the motion for preliminary injunction on April 27, and their answer to the complaint on May 1.

On May 9, the trial court heard oral argument on the motion for preliminary injunction. After receiving supplemental briefs from both parties, on May 12, the court filed an order granting plaintiffs' motion for a preliminary injunction (the May 12 order).[7]

The May 12 order provided that defendants were "enjoined and restrained . . . from denying any high school senior who is a member of a 2006 graduating class and who is otherwise eligible to graduate and receive a diploma from participating in graduation exercises and receipt of such diploma solely on the ground that such student has not passed all parts of the CAHSEE." The court noted that its order did not prevent anyone from annotating a diploma to indicate that the recipient had passed the CAHSEE, or from reporting a student's status as having passed or not passed the CAHSEE to the extent that information was subject to disclosure under existing law. The court also emphasized that its order was directed only at the class of 2006, and it did not stay continued administration of the CAHSEE or continued efforts to assist students to prepare for it. Later in the day on May 12, the court denied defendants' motion for a temporary stay of the May 12 order pending their anticipated appeal.

On May 19, defendants filed with the California Supreme Court a petition for a writ of certiorari, mandate, or other appropriate relief, together with a request for an immediate stay of the preliminary injunction granted by the trial court's May 12 order. On May 22, plaintiffs filed an opposition to the request for immediate stay. Defendants filed a reply later the same day.

On May 24, the Supreme Court issued an order providing that "Respondent and real parties in interest are ordered to show cause before the Court of Appeal, First Appellate District, why the relief sought in the petition for writ of mandate should not issue. Because at this juncture this court is not persuaded that the relief granted by the trial court's preliminary injunction—which would require school districts to grant high school diplomas to students despite the students' failure to pass the [CAHSEE]—would be an appropriate remedy even if plaintiffs were to prevail in their underlying claims, the injunction issued by the trial court in its order of May 12, 2006, is

---

[7] The May 12 order also included a case management order setting a case management conference and requiring counsel to take specified steps to prepare for that conference. That portion of the order is not before us, and nothing in this opinion should be construed to affect it in any way.

stayed pending the Court of Appeal's determination of this writ proceeding. This stay does not preclude the trial court from conducting further proceedings in the underlying matter during the pendency of the writ proceeding in the Court of Appeal. [¶] Upon receipt of this writ proceeding, the Court of Appeal is directed to establish a schedule for expedited briefing and argument."

In compliance with the Supreme Court's order, we set an expedited schedule for the parties and amici curiae to file briefs and responses thereto. Briefing was complete on July 5, and we heard oral argument on July 25.

## III.

## Discussion

## A.

## Standard of Review

"In deciding whether to issue a preliminary injunction, a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction. [Citation.] Appellate review is limited to whether the trial court's decision was an abuse of discretion. [Citation.] [¶] The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction. [Citation.] Of course, '[t]he scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits.' [Citation.] A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim. [Citation.] Unless potential merit is conceded, an appellate court must therefore address that issue when reviewing an order granting a preliminary injunction." (*Butt v. State of California* (1992) 4 Cal.4th 668, 677–678 [15 Cal.Rptr.2d 480, 842 P.2d 1240] (*Butt*).) To the extent that the trial court's assessment of likelihood of success on the merits depends on legal rather than factual questions, our review is de novo. (*Citizens for Better Streets v. Board of Supervisors* (2004) 117 Cal.App.4th 1, 6 [11 Cal.Rptr.3d 349] [construction of statute]; *San Diego Unified Port Dist. v. U.S. Citizens Patrol* (1998) 63 Cal.App.4th 964, 969 [74 Cal.Rptr.2d 364] [constitutional issue].)

■ In reviewing the injunction issued in this case, we must also bear in mind the extent to which separation of powers principles may affect the propriety of injunctive relief against state officials. In that context, our Supreme Court has emphasized that "principles of comity and separation of powers place significant restraints on courts' authority to order or ratify acts normally committed to the discretion of other branches or officials. [Citations.] In particular, the separation of powers doctrine (Cal. Const., art. III, § 3) obligates the judiciary to respect the separate constitutional roles of the Executive and the Legislature." (*Butt, supra,* 4 Cal.4th at p. 695.) In the same context, the Supreme Court has stressed that "a judicial remedy must be tailored to the harm at issue [citations]," and that "[a] court should always strive for the least disruptive remedy adequate to its legitimate task." (*Id.* at pp. 695–696.)

## B.

### Probability of Success on the Merits

When the trial court assessed plaintiffs' likelihood of success on the merits in its May 12 order, it gave little or no weight to plaintiffs' statutory and due process arguments, but found their equal protection argument "far more compelling." The court concluded that plaintiffs had shown a likelihood of success both as to their general claim of deprivation of equal access to education (equal protection claim), and as to their specific claim that the "arbitrary" allocation of the supplemental funding violated equal protection. Because the trial court based its decision to issue the challenged injunction on a finding of likely success on the merits only as to those two claims, we will focus our review on those issues.

### 1. *Equal Protection*

The gravamen of plaintiffs' primary equal protection claim is narrow, and quite specific. The focus of their claim is that it is a violation of the equal protection clause of the California Constitution to apply the CAHSEE diploma requirement to students who, they allege, have passed all of the course requirements for graduation, but who have not been provided with the educational resources necessary to enable them to pass the CAHSEE.

It is important to note that plaintiffs have not made a facial challenge either to the CAHSEE itself or to the CAHSEE diploma requirement. As the trial court explained, "[p]laintiffs are not challenging the CAHSEE itself, and are not seeking to enjoin the continued administration of the tests, or efforts to prepare students state wide [*sic*] to be able to pass it. They seek only to delay the implementation of the diploma condition, and only as it affects this year's graduating class."

In other words, plaintiffs do not dispute that the state has the authority to determine, or to authorize local agencies to determine, what the requirements for high school graduation shall be, and whether a given student has satisfied them. In California, the Legislature has determined that, effective with the class of 2006, those requirements shall include passage of the CAHSEE, in addition to satisfaction of all locally imposed criteria for high school graduation. Plaintiffs do not question the Legislature's constitutional prerogative to impose that requirement. Nor have plaintiffs argued that the CAHSEE imposes unfair or academically invalid standards for high school graduation. (Cf. *GI Forum Image de Tejas v. Texas Educ. Agency* (W.D.Tex. 2000) 87 F.Supp.2d 667, 682–683 [Texas high school exit exam that conformed to accepted academic norms did not violate students' substantive due process rights].) Finally, plaintiffs do not contend that the CAHSEE, as designed, is an invalid test of the skills it was designed to measure.

As the trial court correctly noted in its May 12 order, established California case law holds that there is a fundamental right of equal access to public education, warranting strict scrutiny of legislative and executive action that is alleged to infringe on that right. (*Butt, supra,* 4 Cal.4th at pp. 685–686, 692; *Serrano v. Priest* (1976) 18 Cal.3d 728, 768 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*).) The trial court also concluded, at least implicitly, that the right of equal access to education includes the right to receive equal and adequate instruction regarding all specific high school graduation requirements imposed by the state, including passing both portions of the CAHSEE. For purposes of this opinion, we assume this conclusion was correct. (Cf. *Debra P. v. Turlington* (5th Cir. 1981) 644 F.2d 397, 406, 408 [state violated equal protection by withholding diplomas from high school seniors based on failure to pass test that included material not actually taught in classrooms].)

Turning to the facts of the present case, the trial court credited plaintiffs' evidence regarding the "disparate effect of . . . scarcity of resources on schools serving economically challenged neighborhoods and communities," and found that "students in economically challenged communities have not had an equal opportunity to learn the materials tested" on the CAHSEE. The court also found that some schools had not yet fully aligned their curriculum to the test, and that lack of adequate preparation and resources had a disproportionate effect on English learners.

Defendants have disputed these findings on appeal, but our review of the record indicates that they are supported by substantial, albeit not uncontroverted, evidence. Given the standard of review and our normal deference to trial court findings of fact, we accept the trial court's conclusion that plaintiffs established a likelihood of success on the merits as to the denial of their fundamental right to equal educational opportunity.

## 2. *Allocation of Supplemental Funding*

The trial court's May 12 order also found that plaintiffs proved a likelihood that they would succeed on the merits on their second claim, namely, that the manner in which supplemental funding for remedial instruction for the class of 2006 had been distributed also violated equal protection.

The legislative formula for the distribution of the supplemental funding, as set forth in former section 37254, was designed to give priority to the school districts with the highest percentage of students who had not yet passed the CAHSEE. The statute defined "eligible pupils" as those who have failed one or both parts of the CAHSEE (former § 37254, subd. (a)), and directed as follows: "(b) The Superintendent [of Public Instruction] shall rank schools on the basis of the percentage of eligible pupils. The Superintendent may give priority to schools with the highest percentage of eligible pupils who have failed both parts of the examination. [¶] (c) From the funds appropriated for purposes of this section, the Superintendent shall apportion six hundred dollars ($600) per eligible pupil to school districts on behalf of schools identified pursuant to subdivision (b) in the order determined by the Superintendent until the funds are exhausted. . . ." (Former § 37254, subds. (b), (c).)

It is undisputed that in distributing the supplemental funding for the 2005–2006 school year, defendants adopted an allocation formula that complied with the statutory requirements. Unfortunately, the $20 million appropriated for that purpose was not nearly enough to provide $600 for each eligible pupil. As a result, under the allocation formula, school districts with CAHSEE failure rates of less than 28 percent received no supplemental funding.

Accepting plaintiffs' characterization of defendants' allocation of the supplemental funding as "arbitrary," the court concluded that plaintiffs could support their equal protection claim on that basis as well. We disagree with the trial court's analysis of this issue. We see nothing "arbitrary" in this formula. It did not violate equal protection principles for the Legislature and the executive branch to decide to allocate a limited sum of money in such a way as to benefit those school districts that evidently had the greatest need for additional assistance in order to raise the CAHSEE pass rates of their students.

 " 'The basic principle that must govern an assessment of any constitutional challenge to a law providing for governmental payments of monetary benefits is well established. Governmental decisions to spend money to improve the general public welfare in one way and not another are "not confided to the courts. The discretion belongs to [the legislative branch],

unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment." . . . In enacting legislation of this kind a government does not deny equal protection "merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " [Citation.]' [Citation.]" (*Cleland v. National College of Business* (1978) 435 U.S. 213, 221 [55 L.Ed.2d 225, 98 S.Ct. 1024] [upholding restrictions on federal educational assistance for veterans, and rejecting equal protection claim based on lack of similar restrictions in other federal educational assistance programs].)

As the foregoing discussion makes clear, if there was any constitutional infirmity with the supplemental funding, it was not that the amount appropriated was improperly distributed, but that it was apparently inadequate to provide all of the plaintiff class members with sufficient remedial instruction to prepare them to pass the CAHSEE prior to their scheduled graduation dates. Indeed, far from being "arbitrary," the pedagogical triage performed by defendants, so as to ensure that the available funds were allocated to those districts most in need, was to be commended.

As to the funding shortfall, we note further only that plaintiffs did not ask the trial court to order defendants to provide additional funds to pay for the necessary instruction. Thus, the question whether such relief would have been constitutionally appropriate, legally justified, or practically feasible is not before us. (See generally *Butt, supra,* 4 Cal.4th at pp. 695–703; *Mandel v. Myers* (1981) 29 Cal.3d 531, 539–540 [174 Cal.Rptr. 841, 629 P.2d 935].)[8]

## C.

### Relative Interim Harm

As we have already noted, in determining whether to issue an injunction, a court must weigh and balance both the likelihood the moving party will succeed in the litigation on the merits of its claim, and also the relative interim harm to the parties if the injunction is granted, or not granted. (*Butt,*

---

[8] Defendants' request for judicial notice, filed on June 23 and granted on June 28, included a copy of then-pending legislation (Assem. Bill No. 1801 (2005–2006 Reg. Sess.)) appropriating additional funds for supplemental education needed by students at risk of failing the CAHSEE during the 2006–2007 fiscal year. On our own motion, we take judicial notice that this legislation was subsequently passed, and was signed by the Governor on June 30. As enacted, the legislation appropriates over $100 million "for allocation by the Superintendent of Public Instruction . . . to school districts to increase the number of pupils that pass the [CAHSEE]." (Budget Act of 2006, Stats. 2006, ch. 47 [at line item 6110-204-0001].)

*supra*, 4 Cal.4th at pp. 677–678.) " 'The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause. [Citation.]' [Citation.]" (*White v. Davis* (2003) 30 Cal.4th 528, 554 [133 Cal.Rptr.2d 648, 68 P.3d 74], italics omitted.)

In their motion for preliminary injunction, plaintiffs argued strenuously that denying diplomas to members of the class of 2006 who had not passed the CAHSEE prior to their scheduled graduation dates would cause them severe and irreparable injury. In support of this contention, they introduced considerable evidence regarding the impact of failure to receive a high school diploma on a student's prospects for success in later life.

In the May 12 order, the trial court found that the threatened harm to plaintiff class members included the "practical realities attendant to life without a high school diploma"; and the "emotional toll attendant to the resulting disadvantages and stigma." Accordingly, the court concluded that "[i]n toto, . . . the evidence of potential harm weigh[ed] heavily in favor of plaintiffs."

While we accept the trial court's findings relating to the threatened harm to plaintiffs, we disagree with the court's conclusion from those findings for several reasons. First, the trial court gave virtually no weight to defendants' proof that at least in some cases, plaintiffs' failure to pass the CAHSEE would only result in a *delay* in their receipt of their high school diplomas, rather than a permanent denial of them.[9] The record makes clear that members of the plaintiff class have nine options available to them by which they can continue their educations and obtain either a high school diploma or a similar certificate:

1. Receive, or continue receiving, supplemental remedial instruction for at least an additional year following completion of the 12th grade (see § 37252, subds. (c), (h));

2. Enroll for an additional year in a public high school or alternative education program in the school district;

3. Enroll in a public school independent study program until they succeed in passing the CAHSEE;

4. Enroll in a public charter school;

---

[9] For example, as already noted, defendants represented to the court at oral argument that the 1,759 students who learned in July that they had passed the CAHSEE at the May administration will receive their diplomas, albeit belatedly, if they are otherwise eligible to graduate.

5. Attend adult school secondary education classes offered by a local school district;

6. Obtain a diploma through an adult education program at a community college—an option that may not require passing the CAHSEE;

7. Obtain a diploma through a county office of education program for dependent or delinquent youth, if permitted by court order;

8. Pass the California High School Proficiency Exam and obtain a Certificate of Proficiency (§ 48412); or

9. Pass the national General Education Development (GED) test and obtain a California High School Equivalency Certificate.

Plaintiffs point out, perhaps correctly, that as a practical matter, not all of these alternatives are available to every student, and that the last two do not culminate in the award of a high school diploma, but rather in certificates that plaintiffs contend have less value. Plaintiffs also complain that even if practical alternatives are available, delaying the pursuit of other educational or employment opportunities while the plaintiff class members pursue these remedial avenues will cause appreciable harm in itself, particularly for students from low-income households.[10]

These contentions are not supported by any specific factual findings of the trial court, however. Rather, the trial court gave only a partial, and fleeting, response to these alternatives, opining that "[r]emaining for a fifth or subsequent year in an already stressed district or attending community college when the student might otherwise be accepted to a four year [*sic*] institution[11] all demonstrate significant risk of harm." This finding is plainly

---

[10] Plaintiffs also premised their claim of irreparable injury on the harm to members of the plaintiff class caused by not being able to participate in graduation ceremonies along with their classmates. We do not view the trial court as having given much weight to this harm, nor do we. It appears from the record that students in many school districts were permitted to "walk" with their classmates despite failing to pass the CAHSEE. In any event, the emotional harm caused by exclusion from one's high school graduation ceremony, while undoubtedly distressing, is not of sufficient weight to support the relief granted by the trial court.

[11] Apparently, one of the named plaintiffs had been accepted to a campus of the California State University despite his failure to pass the CAHSEE. This circumstance is manifestly inadequate to justify the issuance of a statewide injunction applicable to *all* members of the plaintiff class, or to conclude that plaintiffs as a group have been harmed irreparably. Moreover, since the lawsuit was filed, three of the original named plaintiffs have passed the CAHSEE. One of these passed even before the May 12 order was issued, and the other two passed while this appeal was pending. A fourth came within two points of passing the March administration.

an inadequate response to defendants' assertion that plaintiffs had considerably overstated the irreparability and seriousness of the harm with which they were threatened.

Based on its preliminary findings, the trial court then concluded that there was "no persuasive credible evidence of harm flowing to any one [*sic*] from granting the requested relief." But, in reaching this conclusion, the court failed to consider important record evidence establishing that granting the relief plaintiffs sought would cause substantial harm to others and—more significantly—to the public interest, and failed to balance that harm against that which plaintiffs would suffer without the relief. It was also based on the false premise that the harm to plaintiffs is not the loss of educational opportunity, but the denial of a diploma.[12]

■ It is undisputed that the CAHSEE requirement was legislatively enacted to accomplish two goals. The first was to ensure that students graduating from California high schools actually possessed the minimum proficiency in core academic skills needed to thrive in an economically competitive society. (Stats. 1999, 1st Ex. Sess. 1999–2000, ch. 1, § 1(b) [legislative finding in support of adoption of CAHSEE that "to ensure that pupils who graduate from high school can demonstrate grade level competency in reading, writing, and mathematics, the state must set higher standards for high school graduation"].) Thus, the CAHSEE provided a way to demonstrate to those outside the academic world that California graduates could compete equally with students from other states whose schools enjoyed higher ranking and esteem than California's. (See Stats. 2002, ch. 1028, § 1(f) [legislative finding in support of High School Pupil Success Act that "the implementation of the [CAHSEE] ha[s] raised expectations of pupil performance"].)

Within the borders of California, until our schools can achieve the academic parity envisioned by the *Williams* litigation and settlement, the CAHSEE also provides students who attend economically disadvantaged schools, but who pass the exit exam, with the ability to proclaim empirically that they possess the same academic proficiency as students from higher performing, and economically more advantaged, schools. Granting diplomas to students who have not proven this proficiency debases the value of the diplomas earned by the overwhelming majority of disadvantaged students who have passed the exit exam.

---

[12] See Discussion, part III.D.2, *post*.

Plaintiffs' answer to this point is to argue that students can simply refer prospective employers to the fact that their diplomas contain an annotation attesting to their passage of the CAHSEE, as a way to dissipate any inference that they might have been granted their diplomas without passing the exit exam. This response underscores one of the pernicious effects of the trial court's injunction, by emphasizing that students who obtain their diplomas by court order, without passing the CAHSEE, will remain in a distinct disadvantaged group, stigmatized forever by their own unannotated diplomas.

As important as the CAHSEE may be to socially disadvantaged students who pass the exit exam, it is of equal importance to plaintiffs who have not passed. The second goal of the CAHSEE is to identify those students who lack the education needed to achieve even the minimal level of proficiency demanded by the exit exam, and to target them for remedial instruction. (See Stats. 1999, 1st Ex. Sess. 1999–2000, ch. 1, § 2 [amending § 37252, subd. (a), in conjunction with adoption of CAHSEE, to provide that summer school instructional programs are to be offered to pupils "who do not demonstrate sufficient progress toward passing the [CAHSEE] . . . ."].) Only in this way can they be assured of gaining the equal educational opportunity for which the instant lawsuit was brought. Therefore, the trial court's injunction mandating that these students receive diplomas, rather than additional remediation, works a cruel irony by depriving plaintiffs of the very education to which they have a fundamental constitutional right.

In addition, in determining that no harm would result from granting plaintiffs the requested relief, the trial court failed to consider countervailing public policy interests. "It is well established that when injunctive relief is sought, consideration of public policy is not only permissible but mandatory. [Citation.]" (*Teamsters Agricultural Workers Union v. International Brotherhood of Teamsters* (1983) 140 Cal.App.3d 547, 555 [189 Cal.Rptr. 627], citing *Loma Portal Civic Club v. American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548] [affirming denial of injunction against flight operations at public airport].) "Where, as here, the plaintiff seeks to enjoin public officers and agencies in the performance of their duties[,] the public interest *must* be considered. [Citation.]" (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1472–1473 [28 Cal.Rptr.2d 734], italics added [affirming denial of preliminary injunction against collection of pollution mitigation fee].) In the present case, therefore, the trial court also erred in failing to take into account the public interest in enforcing the CAHSEE diploma requirement as an integral part of the statutory scheme adopted by the Legislature in an effort to raise academic standards in California public schools.

Finally, the ostensibly interim relief of forcing the "social promotion"[13] of plaintiffs, by ordering that they be given diplomas, in fact does not maintain the status quo of the litigation, but ends it. Surely the trial court did not expect that if defendants ultimately prevailed in the litigation, plaintiffs would give back the diplomas they had received under the mandate of the court's preliminary injunction. (Cf. *White v. Davis, supra,* 30 Cal.3d at pp. 554, 561 [because ultimate goal in deciding whether to issue preliminary injunction is to minimize harm that may be caused by erroneous interim decision, court considering issuance of preliminary injunction cannot ignore possibility that its initial assessment of merits may turn out to be in error].) Indeed, plaintiffs' counsel conceded at oral argument before us that this eventuality was highly unlikely. In failing to consider the effect of its interim relief on the status quo of the litigation, the trial court ignored the foundational legal principle that the general purpose of a preliminary injunction is to preserve the status quo pending a final adjudication of the claims on the merits. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889]; see also *King v. Meese* (1987) 43 Cal.3d 1217, 1227 [240 Cal.Rptr. 829, 743 P.2d 889].)

Nevertheless, plaintiffs argue that the May 12 order did preserve the status quo, premised on their definition of the status quo as the historical practice of granting students diplomas based on their completion of local school district requirements, without requiring them to pass any statewide test. This argument fails to acknowledge that long before this litigation was filed, this historical practice had ceased to be the *current* status quo. Once it was determined, in 2003, that the CAHSEE diploma requirement would be implemented starting with the class of 2006, it was no longer reasonable for students to expect that any such "historical practice" would continue. Moreover, the status quo at the time this lawsuit was filed was, by definition, that none of the plaintiff class members would receive a high school diploma. Thus, far from preserving the status quo, the trial court's injunction disrupted it to a point where, had the Supreme Court not issued a stay, it would have been extremely difficult, if not impossible, to return to the status quo if defendants ultimately prevail in the litigation.

The failure to consider and balance the harm from granting the injunction, and the failure to give due consideration to the obligation to preserve the

---

[13] See *Debra P. v. Turlington* (5th Cir. 1981) 654 F.2d 1079, per curiam opinion on denial of rehearing ("To suggest that the panel opinion has somehow found a constitutional right to a diploma in the absence of an education is to play word games which we feel are both inappropriate and unfounded. Apparently our dissenting brothers would approve of 'social promotions' coupled with a denial of a diploma as complying with the legal requirements of equal educational opportunities within a unitary school system."). (Italics omitted.)

status quo, are sufficient error to require us to vacate the trial court's May 12 order.

## D.

## Appropriate Nature and Scope of Relief

### 1. *The Trial Court's Injunction Exceeds the Limits of Judicial Power*

The trial court's preliminary injunction was statewide, and barred the denial of diplomas to *any* members of the class of 2006 on the basis of the CAHSEE diploma requirement.[14] In deciding to issue the preliminary injunction that plaintiffs requested, the trial court relied on the Supreme Court's affirmance of orders granting injunctive relief in two cases involving the fundamental right of access to education: *Butt, supra,* 4 Cal.4th 668, and *Serrano II, supra,* 18 Cal.3d 728. (See also *Serrano v. Priest* (1971) 5 Cal.3d 584, 608–610 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*) [establishing education as fundamental right for equal protection purposes].) The relief issued in those cases was, however, fundamentally different from the relief granted by the trial court here, and an analysis of those differences will serve to highlight one of the reasons for our conclusion that the issuance of the injunction in the present case was an abuse of the trial court's discretion.

In *Serrano II*, the trial court found that despite legislative changes in California's public school financing that had been enacted in response to *Serrano I, supra,* 5 Cal.3d 584, "substantial disparities in expenditures per pupil resulting from differences in local taxable wealth . . . continue[d] to exist," and that those "[s]ubstantial disparities . . . [would] cause and perpetuate substantial disparities in the quality and extent of availability of educational opportunities." (*Serrano II, supra,* 18 Cal.3d at pp. 746–747.) Accordingly, the trial court concluded that "the system before it was violative of our state constitutional standard" of equal protection, ordered that this violation be remedied, and "set a period of six years from the date of entry of

---

[14] Because of our disposition of this proceeding, we need not reach the issue whether it was proper to grant an injunction requiring the issuance of diplomas without joining as defendants the local school districts that issue those diplomas. We note, however, that under *Butt, supra,* 4 Cal.4th 668, school districts act as agents of the state, and that in another context, our Supreme Court has held that an injunction requiring the provision of benefits to individuals, due to the invalidation of a state regulation under which those benefits were improperly withheld, binds local officials who act as agents of the state in administering those benefits, even if the local officials were not parties to the underlying action. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 905–909 [141 Cal.Rptr. 133, 569 P.2d 727].)

judgment as a reasonable time for bringing the system into constitutional compliance." (*Id.* at p. 749, fn. omitted.) The trial court in *Serrano II* specifically noted that its judgment "was not to be construed to require the adoption of any particular system of school finance, but only to require that the plan adopted comport with the requirements of state equal protection provisions." (*Id.* at p. 750.) To ensure that its order was carried out, the court retained jurisdiction to issue further relief in the event of "a failure by the legislative and executive branches of the state government to take the necessary steps . . . within a reasonable time" to design and implement a public school financing system that would comply with state equal protection requirements. (*Ibid.*)

█ In upholding the trial court's order, the majority of the California Supreme Court pronounced itself in agreement with the dissenting justices that " 'the ultimate solutions [to the problem of educational inequality] must come from the lawmakers and from the democratic pressures of those who elect them.' " (*Serrano II, supra,* 18 Cal.3d at p. 775, fn. 54.) Thus, in upholding the trial court's injunction, the majority explicitly declined—as had the trial court—"to address ourselves to the constitutional merits of the various financing alternatives . . . developed in the scholarly literature . . . ." (*Ibid.*) Instead, the court restricted itself to expressing "confiden[ce] that the Legislature, aided by what we have said today . . . , will be able to devise a public school financing system which achieves constitutional conformity from the standpoint of educational opportunity . . . ." (*Ibid.*)

In *Butt,* the trial court was confronted with the prospect that a particular school district would close its schools six weeks before the end of the scheduled school term because it had run out of funds. It issued an order directing the state and the relevant executive branch officials, including the Superintendent of Public Instruction (SPI), "to ensure 'by whatever means they deem appropriate' that . . . students [in the affected district] would receive their educational rights," but "made clear that '[h]ow these defendants accomplish this is up to the discretion of defendants. . . .' " (*Butt, supra,* 4 Cal.4th at p. 694.) The SPI and the State Controller (Controller) then proposed a loan arrangement to keep the schools open for the remainder of the school year, conditioned on the court's willingness to order that the SPI could temporarily assume control of the school district and appoint a trustee. The trial court issued the requested order, and also authorized the Controller to obtain the funds needed for the loan from funds that the Legislature had previously appropriated for other specific purposes, but which remained unspent. (*Id.* at pp. 694, 697.)

The Supreme Court affirmed the trial court's decision that "the State has a constitutional duty . . . to prevent the budgetary problems of a particular school district from depriving its students of 'basic' educational equality," and that preliminary injunctive relief was warranted. (*Butt, supra,* 4 Cal.4th at pp. 674, 693–694.) It also held that, "in light of the 'unique emergency financial conditions' presented by the case," the court did not err in approving the loan conditions proposed by the SPI, including the SPI's temporary takeover of the school district. (*Id.* at pp. 695–697.) The one aspect of the injunction granted by the trial court in *Butt* of which the Supreme Court disapproved was its provision authorizing the Controller to fund the loan by diverting unspent funds from money that the Legislature had previously appropriated for specific purposes. The Supreme Court overturned this part of the injunction on separation of powers grounds, holding that "[b]y diverting the funds from their earmarked destinations and purposes, the court invaded the Legislature's constitutional authority." (*Id.* at p. 698.) The court reaffirmed that the courts have the power to order the executive branch to pay specified obligations out of general operating budgets, but held that this power does not extend to the diversion of funds that the Legislature has allocated for specific purposes. (*Id.* at pp. 697–703.)

Similarly, in *Crawford v. Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28], the Supreme Court affirmed a trial court's injunction requiring a school district's board to "prepare and implement a reasonably feasible desegregation plan" (*id.* at p. 285; see also *id.* at pp. 307–308), but cautioned that once a plan promising meaningful progress had been implemented, "the court should defer to the school board's program and should decline to intervene in the school desegregation process so long as such meaningful progress does in fact follow." (*Id.* at p. 286; see also *id.* at pp. 305–306.)

As the foregoing discussion demonstrates, in both *Serrano II* and *Butt*, as well as in *Crawford,* the injunctive relief issued by the trial courts, and upheld by the Supreme Court, was limited to directing the legislative and executive branches to find a way to redress the particular constitutional violation identified by the judicial branch, by providing the affected students with the funding needed to ensure their equal access to educational opportunity. Indeed, the one aspect of the trial court's order that the Supreme Court reversed in *Butt* was the one respect in which the order went beyond that limitation, and would have directly countermanded a specific legislative directive.

The injunction issued by the trial court in the present case stands in sharp contrast to the relief granted and upheld in *Serrano II* and *Butt*. Rather than requiring the defendants to develop a plan to remedy an infringement of

educational equality, as the trial courts did in *Serrano II* and *Butt*, the trial court here imposed its own remedy by enjoining the enforcement of the statute imposing the CAHSEE diploma requirement. This approach hardly comports with our Supreme Court's directive in *Butt* that equitable relief against other branches of government must be restrained by "principles of comity and separation of powers," and that "[a] court should always strive for the least disruptive remedy adequate to its legitimate task." (*Butt, supra*, 4 Cal.4th at pp. 695, 696; see also *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 568 [53 Cal.Rptr.2d 878] [where Legislature has enacted statutes expressly intended to address issues of public policy raised in litigation, judicial restraint is called for, and courts should "decline the invitation to undo what the Legislature has done" by issuing injunctive relief].)

In seeking judicial intervention, plaintiffs rely in part on the fact that the statutory scheme creating the CAHSEE requires that the school curriculum be aligned to the test, and that remediation be provided to students who have difficulty passing it. (§§ 60850, subd. (f)(3), (4), 60851, subd. (f), 60853.) Plaintiffs may be correct that the state's failure to provide a properly aligned curriculum and adequate remediation amounts to a violation of plaintiffs' statutory rights, and perhaps of their constitutional rights as well. The appropriate judicial remedy for any such violations, however, would be to order the state to provide the mandated curriculum alignment and remediation.[15] It is not to mandate that all students meeting district requirements be given high school diplomas, regardless of the reason for their failure to pass the CAHSEE. (Cf. *Brookhart v. Illinois State Bd. of Educ.* (7th Cir. 1983) 697 F.2d 179, 188 [appropriate remedy for due process violation arising from lack of adequate notice of exit exam requirement would be to require school district to provide free remedial education affording students reasonable opportunity to learn tested material; where passage of time had rendered that relief unrealistic, however, court ordered issuance of diplomas to 11 individual plaintiffs, all suffering from disabilities].)

Similarly, plaintiffs argue, and the trial court found, that the changes mandated by the *Williams* settlement did not occur soon enough to allow the class of 2006 a fair chance to pass the CAHSEE. This may well be true, and it may be that those changes will not be sufficient to provide that opportunity for some years to come. Even accepting the trial court's finding, however, at

---

[15] Plaintiffs concede that "[i]f the CAHSEE program actually made equal educational opportunities and adequate remediation available to all students who need it, there might be no violation." We agree, though we would say "would" rather than "might."

most it justified ordering defendants to provide additional assistance to give students—including those in the class of 2006—a full and fair opportunity to learn the skills needed to pass the CAHSEE.[16] It did not justify the issuance of an injunction requiring defendants to grant diplomas to all otherwise eligible students, despite their failure to pass the CAHSEE.

Plaintiffs deny that the trial court's injunction infringed on the separation of powers, pointing to cases in which preliminary injunctions enjoining enforcement of a statute were deemed appropriate. However, as plaintiffs themselves acknowledge, these cases all stand for the relatively unremarkable legal proposition that the enforcement of a law found to be unconstitutional can be enjoined.

For example, in *Conover v. Hall* (1974) 11 Cal.3d 842 [114 Cal.Rptr. 642, 523 P.2d 682], the principal case on which plaintiffs rely, the Supreme Court upheld the issuance of a preliminary injunction preventing state officials from enforcing a state law setting a maximum welfare work-expense allowance that was incompatible with a governing federal statute. (*Id.* at pp. 845–846.) The court noted that "[a] host of cases interpreting these sections [Civil Code provisions limiting the court's jurisdiction] . . . do not apply to an unconstitutional or invalid statute or ordinance and that courts have full authority to enjoin the execution of such enactments. [Citations.]" (*Id.* at p. 850; see also *Kash Enterprises, Inc. v. City of Los Angeles* (1977) 19 Cal.3d 294, 299 [138 Cal.Rptr. 53, 562 P.2d 1302] [trial court erred in refusing to grant preliminary injunction as to portion of ordinance that was unconstitutional on its face].)

As already noted *ante*, however, while plaintiffs raise equal protection and due process claims relating to the denial of their fundamental right to a public education, they do not allege that the statute imposing the CAHSEE diploma requirement (§ 60851) is itself unconstitutional. Plaintiffs only sought to enjoin the enforcement of that statute as applied to them, because they were unconstitutionally denied the ability to learn the skills needed to pass the CAHSEE. Therefore, cases upholding preliminary injunctions restraining enforcement of facially unconstitutional laws are inapplicable here, and do not undercut the limitations discussed in *Butt* and *Serrano II* on the use of

---

[16] In that connection, we note that while plaintiffs contend that the options put forward by defendants for plaintiffs to continue studying for the CAHSEE after their fourth year of high school are not realistic as a practical matter, plaintiffs did not seek an injunction requiring defendants to provide options that *were* practical and realistic. Such options are not impossible to imagine. For example, undisputed evidence in the record discloses that the Los Angeles Unified School District planned to offer a "Learn and Earn" program in the summer of 2006 that would enable a limited number of high school juniors and seniors who had not yet passed the CAHSEE, but were on track to graduate, to receive intensive CAHSEE instruction during part of the day, and work at part-time jobs during the remainder.

judicial power to control the acts of the executive or legislative branches of state government in the area of public education.

## 2. *The Relief Granted by the Injunction, Requiring That Diplomas Not Be Withheld, Was Not Tailored to the Fundamental Right Allegedly Infringed*

In directing defendants not to withhold diplomas from all students who failed to pass the CAHSEE, the trial court relied in part on the assumption that for the purpose of plaintiffs' equal protection claim, access to education includes access to a diploma, which the trial court characterized as the "final fruits" of that education. On this point—a legal rather than a factual one—we again part company with the trial court. We believe the trial court's May 12 order erred by focusing its remedy on equal access to *diplomas* rather than on equal access to *education* (and the funding necessary to provide it). In so doing, the trial court failed to heed *Butt*'s caution that "a judicial remedy must be tailored to the harm at issue. [Citations.]" (*Butt, supra,* 4 Cal.4th at p. 695.)

The purpose of education is not to endow students with diplomas, but to equip them with the substantive knowledge and skills they need to succeed in life. A high school diploma is not an education, any more than a birth certificate is a baby. Its purpose is to symbolize the holder's acquisition of a certain level of knowledge and skills. Students who successfully completed their high school educations, but who did not receive diplomas for some reason (for example, because their school records were destroyed in a natural disaster), would still in fact possess the same level of education as persons with high school diplomas. As we have observed earlier, on the other hand, students who did not successfully complete high school, but who were awarded their diplomas anyway, would not, in fact, have acquired a high school education.

In short, we see a distinction, where the trial court did not, between an equal protection claim based on the well-established fundamental right to an *education*, and an equal protection claim based on the asserted fundamental right to a *high school diploma*. In our view, the cases holding that education is a fundamental right for equal protection purposes under California law do not necessarily support the entirely different proposition that there is a fundamental right to be awarded a high school diploma—a proposition for which plaintiffs have not cited any persuasive authority.[17]

---

[17] Plaintiffs and amici curiae have cited some cases holding that for due process purposes, there is a property interest in the right to receive a high school diploma upon completing all stated requirements. (E.g., *GI Forum Image de Tejas v. Texas Educ. Agency, supra,* 87 F.Supp.2d 667; *Brookhart v. Illinois State Bd. of Educ., supra,* 697 F.2d 179; *Debra P. v.*

For the foregoing reason, we disagree with the trial court's conclusion that directing defendants to give plaintiffs diplomas was an appropriate remedy to further the equality in education that plaintiffs seek by their lawsuit. Instead, as we have already observed, doing so would have ensured that the state would never live up to its pedagogical responsibility to these students, and would inadvertently have perpetuated a bitter hoax: that the diplomas plaintiffs would have obtained under the court's May 12 order somehow would have equipped them to compete successfully in life, even though they had not actually acquired the basic academic skills measured by the CAHSEE.

### 3. The Scope of the Trial Court's Injunction Is Overbroad

Even were we to assume the trial court had both the authority and the justification to grant the requested relief, the scope of the injunction was still impermissibly overbroad. Indeed, the trial court acknowledged as much in the May 12 order when it noted that plaintiffs' showing did not allow the court to identify which plaintiff class members could trace their failure to pass the CAHSEE either to inadequate school resources or to lack of access to the supplemental funding, and commented that "no suggestion has been made of a workable mechanism for doing so." Thus, the court conceded that issuing the injunctive relief plaintiffs were requesting might result in a windfall for students whose failure to pass the CAHSEE did not result from any of the adverse conditions that constituted the factual basis for plaintiffs' claims. The court deemed this result preferable, however, to denying diplomas to students who had suffered from disparities in their opportunities to learn.

In light of the strictures on judicial power emphasized in *Butt*, we believe the trial court erred in this regard. As we have pointed out earlier, the Supreme Court in *Butt* has cautioned courts that in fashioning injunctive relief to remedy unequal educational opportunities on an interim basis, "[a]

*Turlington, supra,* 644 F.2d 397; *Board of Educ. v. Ambach* (N.Y.Sup.Ct. 1981) 107 Misc.2d 830 [436 N.Y.S.2d 564], revd. in part and mod. *sub nom. MTR Board of Educ. v. Amback* (N.Y.App.Div. 1982) 90 A.D.2d 227 [458 N.Y.S.2d 680]; cf. *Anderson v. Banks* (S.D.Ga. 1981) 520 F.Supp. 472, 505.) As we have noted, the trial court here rejected plaintiffs' claim that their due process rights had been violated in connection with the adoption of the CAHSEE diploma requirement, and we concur.

Some amici curiae have also cited *Anderson v. Banks, supra,* 520 F.Supp. 472, in support of plaintiffs' equal protection claims. That case, however, involved a school system that had long been racially segregated by law, and an exit exam requirement that was imposed on short notice, along with a discriminatory tracking system, shortly after the schools were forced to integrate. Thus, the relief granted in that case, to the extent it rested on an equal protection theory, was based not on the alleged denial of a fundamental right, but on racial discrimination. (*Id.* at pp. 498–503, 512.) Plaintiffs do not contend that the present case involves any history, much less recent history, of de jure segregation. Therefore, *Anderson,* like the due process cases cited, is clearly inapposite.

court should always strive for the least disruptive remedy adequate to its legitimate task." (*Butt, supra*, 4 Cal.4th at p. 696.) This the trial court plainly did not do. The scope of the relief granted affected every high school in the state regardless of circumstances, and would have required the granting of diplomas to 47,000 high school students regardless of how many of that number were actually educationally disadvantaged.

Plaintiffs seek to defend the trial court's statewide injunction by arguing that when a test is found to be discriminatory, a court may prohibit reliance on it even as to persons not affected by the underlying discrimination. The federal cases on which plaintiffs rely, however, are all distinguishable.

In *Gaston County v. United States* (1969) 395 U.S. 285 [23 L.Ed.2d 309, 89 S.Ct. 1720], the United States Supreme Court upheld a decision under the Voting Rights Act of 1965 (42 U.S.C. § 1973b) precluding the reinstatement of a literacy test as a condition of the right to register to vote in a jurisdiction where segregated schools had resulted in a low literacy rate among black voters. In *Griggs v. Duke Power Co.* (1971) 401 U.S. 424 [28 L.Ed.2d 158, 91 S.Ct. 849], the Supreme Court held that under title VII of the Civil Rights Act of 1964, an employer could not base hiring and promotion decisions on a high school completion requirement and an intelligence test that had a disparate impact on black job applicants and workers, and that had not been shown to be job related.[18] In *Castaneda v. Pickard* (5th Cir. 1981) 648 F.2d 989, 1013–1015, the Fifth Circuit held that if the plaintiffs could prove that a Texas school district's ability grouping (tracking) scheme was a vestige of past unlawful discrimination against Mexican-American students, it would be improper for the school district to use tests administered in English to determine Spanish-speaking students' placement into ability groups in subjects other than English.

In all of these cases, precluding use of the challenged test afforded relief to the members of the affected class in a very direct way, by giving them access to the specific right they alleged they had been denied: voter registration, a job or promotion, or an appropriate educational placement. Thus, enjoining use of the test was an appropriate remedy for the cause of action alleged. In the present case, by contrast, the right that plaintiffs allege they have been denied is the right to equal and adequate educational resources. Enjoining the CAHSEE diploma requirement does nothing to enhance plaintiffs' access to that right. If anything, it undercuts it by eliminating the need for defendants to support plaintiffs in learning the skills tested on the CAHSEE.

---

[18] Plaintiffs' reliance on *Griggs v. Duke Power Co.* is somewhat ironic, given that opinion's emphasis on the importance of focusing on workers' actual skills rather than on whether they have a high school diploma. As the *Griggs* court put it, "Diplomas . . . are useful servants, but Congress has mandated the commonsense proposition that they are not to become masters of reality." (*Griggs v. Duke Power Co., supra*, 401 U.S. at p. 433.)

Plaintiffs virtually concede the overbreadth of the trial court's injunction in their argument that some students in their putative plaintiff class "actually know the material, but do not pass the exit exam due to test anxiety." But plaintiffs have not argued, much less established, that there is any *constitutional* violation involved in depriving a student of a diploma when he or she has in fact received the educational resources required to pass the CAHSEE, but has not been able to do so because of "test anxiety."

Plaintiffs alternatively complain that defendants have not suggested any other remedy. Unlike the trial court in *Butt*, however, the trial court here did not frame its May 12 order in a way that permitted defendants to do so. In any event, the burden was on plaintiffs, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 9:632.1, p. 9(II)-30 (rev. # 1, 2005); cf. *Anderson v. Souza* (1952) 38 Cal.2d 825, 840–845 [243 P.2d 497] [where plaintiffs sought injunction entirely prohibiting use of private airfield for aviation, burden was on plaintiffs to prove that airfield could not be operated at all without constituting a nuisance].) As plaintiffs' counsel acknowledged at oral argument, it was plaintiffs' burden, not defendants', to formulate the nature of the remedy they were seeking. Having failed to offer the trial court any alternative to a statewide, across-the-board ban on enforcement of the CAHSEE diploma requirement, plaintiffs cannot be heard to complain on appeal that defendants somehow had the legal obligation to suggest a different form of injunction.

Moreover, the urgency with which the trial court was forced to decide plaintiffs' motion may have been, to some extent, of plaintiffs' own making—a fact that the trial court, as a court of equity, should have taken into account in determining what weight to give plaintiffs' claim of imminent irreparable injury. (*Lusk v. Krejci* (1960) 187 Cal.App.2d 553, 556 [9 Cal.Rptr. 703] ["Long delays in assertion of rights can be the basis of denial of mandatory injunctive relief."]; *Fay Securities Co. v. Mortgage G. Co.* (1940) 37 Cal.App.2d 637, 642 [100 P.2d 344] [same]; *Dolske v. Gormley* (1962) 58 Cal.2d 513, 520–521 [25 Cal.Rptr. 270, 375 P.2d 174] [delay in seeking injunction against encroachments is factor to be considered in determining whether relief is warranted]; but cf. *Youngblood v. Wilcox* (1989) 207 Cal.App.3d 1368, 1376 [255 Cal.Rptr. 527] [trial court did not abuse discretion in finding preliminary injunction not barred by laches, where plaintiff delayed bringing suit for eight months after expulsion from country club in hope of resolving dispute informally].) Plaintiffs, and their counsel, were well aware by the beginning of the 2005–2006 school year that thousands of

members of the class of 2006 were at risk of being denied their diplomas because of the low pass rate on the CAHSEE experienced by various disadvantaged groups.[19] Had this litigation been initiated at that time, rather than in February 2006—only three or four months before the end of the school year—there would have been more time to try to devise a way to provide meaningful remediation to the plaintiff class members *before* their scheduled graduation dates.

## IV.

## CONCLUSION

There is no controversy about the fundamental issues of public policy implicated in the case now before us. The parties and amici curiae unanimously agree—as do we—that all California children should have equal access to a public education system that will teach them the skills they need to succeed as productive members of modern society. Nor is there any genuine disagreement that California's public education system has fallen short of achieving that goal in recent decades, as the Legislature[20] and the Governor[21] have both recognized.

In 1999, the Legislature decided that one way to address the inadequacy of California's education system was to create the CAHSEE, and to require students to pass it in order to receive their high school diplomas, while providing remedial education for those students not yet having the skills to pass. The Legislature also conferred discretion on the executive branch to

---

[19] On October 11, 2005, plaintiffs' counsel wrote to the Governor, the president of defendant State Board of Education, and defendant Superintendent of Public Instruction, averring that "nearly 100,000 seniors have not passed one or both" portions of the CAHSEE, and that "the exam is having a disproportionate impact on Latinos, African Americans, and limited English proficient students." The letter was referenced in plaintiffs' complaint in this action, and a copy was attached as an exhibit. The purpose of the letter was to urge defendants to adopt alternatives to the CAHSEE, as permitted by section 60856. At oral argument in this court, plaintiffs' counsel explained the timing of the lawsuit by noting that it was not until early 2006 that defendants finally decided that no alternatives to the CAHSEE would be offered. Plaintiffs' counsel's efforts to resolve the issue through administrative action before filing suit are commendable, but the fact remains that the timing of the lawsuit made the trial court's task much more difficult.

[20] In a 2003 report entitled "The California Master Plan for Education," a joint legislative committee acknowledged that "The sobering reality of California's education system is that too few schools can now provide the conditions in which the State can fairly ask students to learn to the highest standards, let alone prepare themselves to meet their future learning needs."

[21] During a press conference regarding the *Williams* settlement, Governor Schwarzenegger stated that it had been " 'a huge mistake' " and " 'outrageous' " for the state to contest the lawsuit, and that in his opinion, it was preferable for the state to " 'come clean' " and admit that " 'we have not provided equal education for many children.' "

determine that the CAHSEE diploma requirement would apply to the high school class of 2006, and that no alternatives would be adopted. Those actions are entitled to substantial deference by the judicial branch, which is constitutionally obligated to refrain from usurping the role of the other two branches in formulating and implementing public policy. (See *Butt, supra,* 4 Cal.4th at pp. 694–703.)

■ We have concluded that the trial court erred in granting a statewide preliminary injunction enjoining defendants from enforcing the statute mandating the CAHSEE diploma requirement, because in so doing, the trial court gave undue weight to plaintiffs' claim of irreparable injury and insufficient weight to defendants' countervailing concerns, and because the relief was legally impermissible, misdirected in character, and overbroad in scope.[22] While we reverse the trial court's order, our action should not be viewed as reflecting indifference to the plight of those students in the class of 2006 whose diplomas were withheld solely because they had not passed the CAHSEE. We have been pleased to note that several of the original named plaintiffs have succeeded in passing the CAHSEE during the pendency of this litigation, and we encourage the remaining plaintiff class members to endeavor to do the same.

We are also aware that the record in this case raises considerable doubt as to whether the improvements in California schools required by the *Williams* settlement will be sufficient, at least in the immediate future, to give all students currently enrolled in high school an adequate opportunity to prepare properly for the CAHSEE. If not, a practical solution should be found, and quickly, in order to avoid a repeat of this litigation next year and thereafter, with the attendant confusion and hardship involved for all concerned. With this in mind, we urge the parties, with the active assistance of the trial court, to step outside their "fog of war" and cooperatively find the pathways necessary to provide equal and adequate access to meaningful remedial assistance to students in the class of 2007 and beyond who enter their senior year of high school with the CAHSEE hurdle still before them. In order for that process to result in any practical benefit to the remaining plaintiff class members, who had hoped to graduate in 2006, it obviously must begin immediately.

---

[22] In light of this disposition, we deem it unnecessary to address defendants' other grounds for challenging the propriety of the May 12 order, including their assertion that the named plaintiffs are not proper class representatives for the putative plaintiff class.

## V.

## DISPOSITION

Let a peremptory writ of mandate issue compelling respondent Alameda County Superior Court to vacate its May 12 order, insofar as that order granted a preliminary injunction. In the interests of justice, this decision shall be final immediately as to this court. (Cal. Rules of Court, rule 24(b)(3).)

Reardon, J., and Sepulveda, J., concurred.